## Price *et al. versus* Maxwell *et al.*

A devise to a school, under the auspices and control of a religious denomination or sect, and confined to the youth of its members both rich and poor, and in which the peculiar views of Christianity as entertained by that denomination, constituted a part of the instruction imparted in the school, is a devise to a *charitable use.*

A gift to a school does not cease to be for charitable uses, because religious instruction is combined in such school with that of a literary and scientific character, nor because its benefits extend alike to the rich and the poor.

Whatever is given for the love of God, or for the love of our neighbour, in the catholic and universal sense, given from these motives and to these ends, free from the stain of everything that is personal, private, or selfish, is a gift for charitable uses.

The words in a statute are generally to be understood in their usual and most known signification; but when terms of art or technical terms are used, and there is nothing in the statute to indicate that they were used in a restricted or popular sense, they must be taken according to the acceptation of the learned in the art, trade, or science, to which they belong.

A devise in trust for such school was therefore a gift for charitable uses, within the meaning of the 11th section of the Act of 26th April, 1855, and the testator having died within one calendar month from the making of the will in which such devise was contained, the gift was void by the provisions of that section.

When a part of the legacy or bequest is not directly to the school, but to form a fund for the increase of the salaries of the teachers, it was in ease of the school, and, equally for a charitable use, as a devise directly to or for the benefit of the school.

Where there are two wills in some respects inconsistent, the latter revokes the former only so far as they are inconsistent with each other, unless there is an express clause of revocation.

But when the property given specifically in the first will is contained in a general devise to the same objects, and for the same purpose, and the appointment of other executors, there is a manifest inconsistency, and evinces an intention that both wills should not stand.

An express clause of revocation of former wills, is not affected or impaired by the failure of the devise contained in the latter will, by reason of the testator dying within the time required by the act to give the devise effect.

Where the second devise fails not by reason of defective execution of the will, but by the incapacity of the devisee to take, or by any other matter *de hors* the will, the first will is thereby revoked.

Independent of the general rule, the Act of 1855 gives the property so devised expressly to the "residuary legatee, devisee, next of kin, or heirs according to law," and there being no residuary legatee or devisee in the latter will, it goes to the next of kin, or heirs according to law.

APPEAL from the Court of Nisi Prius.

A bill in equity was filed in the Supreme Court at Nisi Prius, by Margery Price and others, claiming to be the heirs and next of kin of Thomas Smith, deceased, against Ebenezer Maxwell and Joseph Scattergood, executors of the last will and testament of the said Thomas Smith, deceased, and also against Samuel Bettle

and others, being some of the persons or committee having charge, management, and control of "The Friends' Boarding School at West-Town." This bill of complainant set forth in substance:

1. That Thomas Smith died upon the 30th April, 1856, unmarried, and without issue, and seised and possessed of a large amount of real and personal property.

2. That on the 10th April, 1856, he made his will, by which he devised and bequeathed, after payment of debts, his property to defendants, Maxwell and Scattergood, his executors, in trust for the benefit of "The Friends' Boarding School at West-Town"; and that the co-defendants are persons having charge of that institution, and represent all the interests in controversy.

3. That "The Friends' Boarding School at West-Town" is a religious and charitable institution within the state of Pennsylvania.

4. That the complainants are the parties who would have been entitled to the real and personal estate, if the said Thomas Smith had died intestate.

And charging—

That inasmuch as the said Thomas Smith died unmarried, and without issue, within one calendar month after the execution of the said will, devising and bequeathing the real and personal property to a charitable and religious institution, they, the complainants, are entitled to so much of the same as is so bequeathed and devised.

And praying—

An account, and a decree that the complainants are so. entitled, and an order upon the executors to transfer the same to them, in such proportions as they are entitled, and for further relief.

The answer of the defendants

1. Admits—the making of the will, by Thomas Smith, on the 10th of April, 1856, and his death on the 20th April, 1856.

2. Denies—that "The Friends' Boarding School at West-Town" is a religious or charitable institution,—and avers the same to be "*A literary institution in the state of Pennsylvania.*"

3. Neither admits nor denies the pedigree of complainants.

4. Avers—that Thomas Smith, on the 3d of August, 1841, made a certain "other last will and testament," and avers that the real estate therein mentioned is part of that of which Thomas Smith died seised.

5. Avers—that even if the devise in the will of the 10th of April, 1856, is invalid, that it is no revocation of the devise in the "former last will," of the 3d August, 1841; and that the devise in the last-mentioned will is valid.

6. Avers—that the devise in the will of April 10th, 1856, is valid, and not within the meaning of the Act of 26th April, 1855.

[Price *et al. v.* Maxwell *et al.*]

7. Admits the value of the estate to be

dollars: that Smith died unmarried, and without issue.

8. Gives a statement of the origin, &c., of "The Friends' Boarding School at West-Town"—referring to certain exhibits attached to the answer.

9. Admits debts of decedent to the amount of about $22,000.

A general replication was filed, and the cause was referred to David Webster, Esquire, as examiner.

The following is a copy of the will of 10th April, 1856:—

" Be it remembered that I, Thomas Smith, of the city of Philadelphia, late lumber merchant, being now in declining bodily health, but of sound disposing mind, memory, and understanding, do make and ordain my last will and testament, as follows, and thereof do appoint my friends, Ebenezer Maxwell and Joseph Scattergood, the executors—that is to say:

" I give, devise, and bequeath all my estate, real and personal property, and effects, whatsoever and wheresoever, unto my executors aforesaid, their heirs, executors, administrators, and assigns for ever;—In trust, nevertheless, in the first place, to pay and satisfy all my just debts and liabilities of every kind; and to the extent which may be found necessary and expedient for this purpose of my will, I do hereby fully authorize and empower my said executors, by public or private sale, at discretion, to sell and dispose of any part or parts of my real estate, and to grant, convey, and assure the same to the purchaser or purchasers in fee simple, without liability on the part of any purchaser to see to the application of the purchase-money. And after all my just debts and liabilities shall have been paid and discharged, then as respects all the residue of my estate, both real and personal, in trust for the uses and purposes of Friends' Boarding School at West-Town, and to make, execute, and deliver such deeds, conveyances, assignments, and assurances of the same or any part thereof, as the Yearly Meeting's Committee, for the time being charged with the care and management of the said boarding school, by any minute or minutes of their proceedings shall order, direct, and appoint, and for no other use or purpose whatsoever. *Provided always,* and it is my will and direction, that the residue of my estate hereby given and devised for the uses and purposes of the said boarding school at West-Town, to the extent of sixty thousand dollars of the value thereof, shall constitute a permanent fund, the yearly income of which shall be applied exclusively to the increase of the salaries of teachers, both male and female, who are and shall be from time to time employed as such at the said boarding school.

" I revoke all wills and testaments by me heretofore made, and declare this only to be and contain my last will and testament.

" In witness whereof I have hereunto set my hand and seal this

Tenth day of the Fourth month, in the year of our Lord one thousand eight hundred and fifty-six (1856).

THOMAS SMITH.

" Signed, sealed, published and declared by Thomas Smith, as and for his last will and testament, in the presence of us, who, at his request and in his presence, have subscribed our names hereto as witnesses.

THOS. WILLIAMSON,

P. WILLIAMSON.

By the will of the 3d August, 1841, the testator devised to Charles Roberts and Thomas Evans, and the survivor of them, and the heirs and assigns of such survivor, all his real estate, particularly describing it, and being part of the property devised in the will of 10th April, 1856, under and subject to the payment of the yearly rents and mortgage debts, with the interest, charged on such estate.

The devisees named to hold such real estate in trust for such uses and purposes, and to make such deeds of conveyance of the said premises, or any part thereof, and to grant, convey, and assure the same unto such persons, and for such estates and uses as the committee for the time being, having charge of the boarding school, under the care of the Yearly Meeting of Friends of Philadelphia, known by the name of "Friends' Boarding School at West-Town," shall by their minutes or by any minute of their proceedings appoint.

A bequest to William Parker of thirty-two shares of the capital stock of the Kensington Bank.

Bequest and devise to testator's mother, Grizzell Smith, absolutely and in fee of the residue of his estate, real and personal, after his " debts (other than mortgage debts) and funeral expenses [should] be first paid and discharged out of the same."

Lastly—Appointment of said Charles Roberts and Thomas Evans to be executors.

On the hearing before the examiner, Passmore Williamson and Joseph Parker, the subscribing witnesses to the will of 1841, neither of whom could distinctly remember the circumstance of the execution, but severally testified to their signatures as witnesses and that of the testator. Passmore Williamson further testified that both wills were written by witness's father, Thomas Williamson, and that the will of 1841 was enclosed in a sealed envelope, and that he knew the same to be in Thomas Williamson's possession from 1846, and that he had received it from him to produce before the examiner, and that the seal was broken at the time the other will was being prepared.

On this envelope the following endorsement was written in pencil: " Revoked will of Thomas Smith. Charles Roberts and

Thomas Smith, executors." On the will the following endorsement was written in pencil: "Sixty thousand of said estate to be a permanent fund, the income of which to be applied to the increase of the salaries of teachers. Ebenezer Maxwell and Joseph Scattergood, executors." These endorsements were in the handwriting of Thomas Williamson. The estate was valued by the appraisers at $112,500.33; less commissions and expenses.

The school to which this devise was made was established by the yearly meeting of Friends, held in Philadelphia, for Pennsylvania and New Jersey, in October and November, 1794, and the school had continued under the charge and care of the same, or a committee appointed by such meeting.

The report of a committee appointed by the yearly meeting, embraced the forms of a bequest to the institution; a devise of real estate for its use, and of a subscription to be opened for its establishment and support. They also reported a set of rules and regulations to govern in the admission of the pupils to the school, and in conducting its affairs and imparting its instructions. These rules provide for a committee on instruction, who was to have the selection of the books to be used in the school, and the system of instruction to be adopted.

A committee on admissions, to whom all applications for the admission of pupils, to be paid for out of the gratuitous funds, were to be made. A committee on accounts. A superintendent, who, under the direction of the committee, was to have the general supervision and control of the institution. The duties of the teachers are defined, and among those the following:—

"As the objects of the yearly meeting in establishing the institution is to afford to the youth of our religious society, placed therein, an education consistent with its principles, the teachers are expected to be vigilant and discreet in requiring a compliance with the rules, and endeavour, by example and precept, to exercise such a religious care and influence over the pupils, as will induce a love and esteem for the doctrines and testimonies of our religious society, on the part of those under their charge."

The Scriptures were required to be frequently read. And Bevan's View of the Christian Religion, as professed by the Society of Friends, and Barclay's Catechism, among others, were designated by the committees and used in the school as text-books in imparting religious instruction.

Under this state of facts, the complainants contended that the devise and bequests to this school, contained in the will of Thomas Smith, of the 10th of April, 1856, were to a charitable use, and therefore void, under the 11th section of the Act of 26th April, 1855, because the will in which they were contained was executed by the testator within one calendar month of his death. That section is as follows:—

" Section 11. That no estate, real or personal, shall hereafter be bequeathed, devised, or conveyed to any body politic, or to any person in trust for religious or charitable uses, except the same be done by deed or will, attested by two credible, and at the time, disinterested witnesses, at least one calendar month before the decease of the testator or alienor, and all dispositions of property contrary hereto shall be void, and go to the residuary legatee or devisee next of kin, or heirs, according to law : *Provided*, That any disposition of property within said period, *bona fide* made for a fair valuable consideration, shall not be hereby avoided."

The defendants maintained that the devises in this will were not, in the true sense and meaning of this law, " in trust for religious or charitable uses." But if this will was therefore void, the will of 1841 remained unrevoked, and the appellees would be entitled to the property under it.

The judge presiding at Nisi Prius dismissed the bill, and the complainants appealed to the court in banc.

*St. G. T. Campbell* and *E. K. Price*, for complainants.—Two questions arise : 1st. Is the will of the 10th April, 1856, operative to pass the property to " The Friends' Boarding School at West-Town ?" 2d. If it be not, can any portion of the property pass to them under the will of the 3d August, 1841 ?

The death of the testator is admitted within the time in which the statute says the devise shall be void. The act in question is no new or extraordinary stretch of legislative power—unduly fettering the freedom of testamentary dispositions—but justified by a wise and humane policy. The right itself of disposition by will was conferred by statute, and why not the right to regulate ? A succession of mortmain acts, since 7 Edward I., A. D. 1279, to 9 Geo. II. c. 36, *Roberts' Dig.* 348, restrained similar devises and bequests. The latter statute required twelve calendar months to elapse instead of one, as contained in our act : .see 1 *Jarm. on Wills*, 198 ; *Boyle on Char.* 506.

Is this school a charitable institution ? It is for the literary, scientific, and religious education of the youth of the religious Society of Friends. None other are admitted. It is exclusive, that the peculiar views and customs of the society, under whose auspicies it was founded, might not be interfered with. Being both literary and religious, it is in legal estimation *charitable.* Lord Chief Justice Camden defines charity to be " a gift to a general public use, which extends to the poor as well as the rich :" Statute 43 Eliz. ; Jones *v.* Williams, *Amb.* 651 ; Morice *v.* The Bishop of Durham, 9 *Ves.* 405. The Stat. 43 Eliz. enumerates in the preamble schools of learning, free schools, and scholars in universities : *Boyle on Char.* 38 and 461 ; Attorney-General *v.* Lord Lonsdale, 1 *Sim.* 109 ; *Bright.* 391. A devise to the British Museum, held

to be a charitable use: *Boyle* 52; Trustees of British Museum *v.* White, 2 *Sim. & Stu.* 594; Magill *v.* Brown, *Bright.* 381; Porter's Case, 1 *Co. R.* 22–25; Martindale *v.* Martin, *Cro. Eliz.* 288. The principles which chancery has adopted under the Statute of Eliz. are in force in Pennsylvania: Witman *v.* Lex, 17 *S. & R.* 91. Ground contributed for a school-house, and built upon, passes to the contributors without a deed, from the favour shown to charities: Martin *v.* McCord, 5 *Watts* 493–5. The "Emaus Orphan House" for the education of poor children, held to be a charity: Brown *v.* Hammell, 6 *Barr* 86. And the same of Dartmouth College: 4 *Wheat.* 567; Wright *v.* Linn, 7 *Barr* 433; Pickering *v.* Shotwell, 10 *Barr* 23; McKissick *v.* Pickle, 4 *Harris* 140. In the Girard College Case, the court decided that the trusts were of an eleemosynary nature, and charitable uses: 2 *How.* 127–196: Fontain *v.* Ravenel, 17 *How.* 369; Wheeler *v.* Smith, 9 *Id.* 78. With these cases before them, the legislature entered upon the duty of framing this statute. It saves to charitable and religious institutions a vast amount of bequests and devises, and in this eleventh section intends to secure to the dying adequate deliberation and exemption from imposition. The words "religious and charitable uses" are used in their broadest significance. It was to cheapen education to those who *could* pay, and *give* it gratuitously to those who *could not*. This, it is submitted, constitutes a *charitable* institution.

But it is likewise a religious institution. It was established to encourage "a guarded education of their youth." It was confined to them, and was to be managed with "religious care and circumspection."

The learned counsel here reviewed the proceedings of the yearly meetings of Friends, as shown by the minutes, and cited many extracts to prove that the design of the institution was to impart religious instruction, as well as literary and scientific—based upon the views of Christianity maintained among the Society of Friends. They also examined and cited from the religious books used in the school, and adverted to the peculiar tenets as maintained among this people, and concluded thus—

"These are the heads, in brief words, of the doctrines and religious views of Friends, and in them their youth are ever taught; and that they may be thus taught without interference, West-Town School was established. They are the views that distinguish them as a religious persuasion; and though they disclaim sectarianism and cherish a universal gospel love, they are views peculiar to that society, and constitute the purpose of its organization and teachings. The society is religious, and its chief institutions and its teaching are religious, and the devise to sustain it must be for religious purposes, as well as charitable. It is charitable in that

[Price *et al. v.* Maxwell *et al.*]

legal sense that comprehends both religious and educational purposes."

That a bequest to such an institution was to "religious and charitable uses," they cited: 4 *Whea.* 29; Bently *v.* Kutz, 2 *Peters* 566; *Boyle* 39–41; McGin *v.* Aaron, 1 *Penns. Rep.* 49; 6 *S. & R.* 218; Thompson *v.* Swoope, 12 *Harris* 481; *Brightly* 406.

If then the dispositions of the will of 1856 be invalid, is the will of 1841 for that reason restored or not revoked? The will latest in date is conclusively the last will of the testator to pass the personalty to the executors in trust, if not for the school, then for the next of kin. It expressly revokes all former wills, and even though the devise be void, this distinct provision will stand. The devise fails not from the infirmity of the instrument, but from the incapacity of the devisee; and, in such cases, the prior devise is revoked: 1 *Jar. on Wills* 154, and the cases there cited.

This is not the case of an implied revocation from two contradictory dispositions made by two wills of the same property, but that of a second will *expressly* revoking the former. The last will takes effect fully as to the payment of debts, appointment of executors, and revocation of the other will. The execution and probate are perfect, and it only fails as to this devise from an incapacity in the testator—not to make a will, but to make such a devise at a period so near his death. Though all the legacies in a will are revoked, yet it remains as to the appointment of executors, and they become trustees for the next of kin: Beard *v.* Beard, 3 *Aik.* 72; 1 *Pick.* 535; 4 *Kent* 590. An express clause of revocation in a subsequent will revokes a former will, although it be not cancelled: Boudinot *v.* Bradford, 2 *Dall.* 268; Jones *v.* Murphy, 8 *W. & S.* 300; Ellis *v.* Smith, 1 *Ves. Jun.* 17. The law favours the heirs at law: Skerret *v.* Bard, 1 *Wh.* 246. The revocation is unconditional. The testator chose to depend upon his chances of life for the requisite period, and we submit the intestate law must dispose of his estate. The attempted bequest and devise being for purposes both religious and charitable, and contained in a will made less than a calendar month before the death of the testator, the prior will expressly revoked, we respectfully submit that they cannot be sustained, and the property must be decreed to the heirs and next of kin.

*Wm. M. Meredith* and *B. Gerhard,* for respondents.—Is the second will invalid? If it is, it is so only under the provisions of the 11th section of the Act of 26th April, 1855. We admit appellants must recover if the devises are within the true meaning of the law "in trust for religious or charitable uses." And it is further admitted that unless the case is within the exceptions hereafter to be treated of, those devises are *charitable,* as that

word has been defined in England, both before and since the stat. 43 Eliz.; and also in Pennsylvania since its settlement. "For no time was so barbarous as to abolish learning and knowledge, nor so uncharitable as to prohibit relieving the poor:" Porter's Case, 1 *Rep.* 24.

It is not denied that religious instruction is imparted and Christian service performed at this school. In this respect it is similar to Girard College; these instructions and services are in accordance with the faith and discipline of the Society of Friends. But if the presence and control of a particular denomination makes a school *religious*, its absence would make it *pagan;* a position refuted by the Girard Will Case. The real question is, what did the legislature mean by the phrase "in trust for religious or charitable uses?"

The legislature defined the terms in this act, and all we ask is that they shall be taken in the sense and meaning which they have attached to them. The words of a statute are to be taken in their ordinary and familiar signification; for *jus et norma loquendi* is governed by usage. But if the usage have been to construe the words of a statute, contrary to their obvious meaning by the vulgar tongue, and the common acceptation of terms, such usage is not to be regarded: *Dwarris on Statutes* 702, and cases there cited; Rex *v.* The Inhabitants of Turvey, 2 *B. & A.* 522; Rex *v.* Powell, 4 *T. R.* 572; Bradley *v.* Clark, 5 *T. R.* 197.

The omission of words in some parts of a statute, is as much to be regarded in its interpretation as the meaning of those which are inserted, and the effect of such an omission will be strengthened when it appears upon comparison with other acts in *pari materia* that such omission was by design. Effect should be given to the particular words of the enacting clause. For when the legislature in the same sentence use different words, the courts will presume they were used to express different ideas: Rex *v.* Bolton, 8 *B. & C.* 74; 5 *Rep.* 118. But when they sometimes insert, and at others omit, a particular clause, it shows that their attention had been drawn to the point, and that the omission is designed: Moser *v.* Newman, 6 *Bing.* 561. But if it were not intended, we can only say *quod voluit non dixit:* 6 *East* 518; Rex *v.* Barham, 8 *B. & C.* 104; Notley *v.* Buck, *Id.* 164; 1 *T. R.* 51; *Dwarris* 706–7.

It is plain that the legislature was using words in their popular and not in their scholastic or technical sense. They have divided in this act the objects which would be embraced under the head of technical "charity" into "religious," "charitable," "literary, and scientific" objects.

Our statute books are full of demonstrations of this point, and we have not found a single instance where the words "charitable" or "religious" were intended to embrace the idea of "literary"

[Price *et al. v.* Maxwell *et al.*]

or " scientific" bodies.   There are many instances to the contrary
where they are not used as synonymous.   The act in question
affords several examples of this; thus section 4, That it shall not
be lawful for any unincorporated *literary, religious, or charitable*
society," &c.

Section 5.   "Provided, that the residence without the limits of
this state, of a portion of the members of any *religious, literary,
charitable, or beneficial society*," &c.

Section 8.   "That any *literary, religious, charitable, or benefi-
cial society*," &c.

Section 10.   "That no disposition of property hereafter made,
for any *religious, charitable, literary, or scientific* use shall fail for
want of a trustee," &c.

Section 12.   "That to avert the evil of an indefinite increase of
the property in mortmain and perpetuity it shall not be lawful
for any *religious, charitable, literary, or scientific*," &c.

Section 15.   "That all dispositions of property hereafter made
to *religious, charitable, literary, or scientific* uses," &c.

The act divides the subjects into 1st religious, 2d to charitable,
and 3d to literary or scientific societies or corporations.   The 11th
embraces only religious and charitable societies in the popular
meaning of the words, excluding literary and scientific bodies.
In the 7th section of the act we think it plain that the legislature
in using the word "religious" meant "religious worship or sepul-
ture;" and by sections 5th and 8th the word "charitable" was
used the same as *beneficial*, something pertaining to benevolence
and kindness in relieving the poor.

The learned gentlemen here referred to and cited a great num-
ber of Acts of Assembly, in which they maintained the same dis-
tinctions were observed.

II.  If the second will is not valid, has the first will any efficacy ?
We contend that it has, and cite the following authorities:

One devises his lands by will, attested by three witnesses, and
afterwards makes another will of his land, which revokes all former
wills; but this will is not duly executed.   The last will being no
will and void, will not amount to a revocation of the former :
Onions *v.* Tryer, 2 *Vern.* 741; Eddlestone *v.* Speake, 1 *Shaw*
89; Laughton *v.* Atkins, 1 *Pick.* 543; Pringle *v.* Executors of
McPherson, 2 *Beav.* 279.

III.  We submit that $60,000 of the devise in question is not
even a technical charity.   We refer to that part of the will which
sets apart that sum, the income of which should be applied exclu-
sively to the increase of the salaries of the teachers.   How does
this differ from a devise to specific persons ?   It has been held in
England that a devise to persons, to be ascertained in a particular
way, is the same as if they had been named in the will : Moggridge
*v.* Thackwell, 7 *Ves.* 76; 1 *Vern.* 248; Mahon *v.* Savage, 1 *Sch.*

*& Lef.* 111; Harding *v.* Glyn, 1 *Atk.* 469; Morris *et Ux. v.* Owen *et Ux.*, 2 *Call's* (*Va.*) *Rep.* 524.

The opinion of the court was delivered by

LEWIS, C. J.—On the 10th April, 1856, Thomas Smith made his will, by which he devised and bequeathed, after payment of debts, all his property, real and personal, to Ebenezer Maxwell and Joseph Scattergood, his executors, in trust for " the uses and purposes of Friends' Boarding School at West-Town, to make conveyances," &c., " as the Yearly Meeting's committee, for the time being, charged with the care and management of the said school, shall order, direct, and appoint." It was further provided in the will that $60,000 of the value of the estate devised should " constitute a permanent fund, the yearly income of which shall be applied exclusively to the increase of the salaries of teachers, both male and female, who are or shall be from time to time employed as such at the said boarding school." The testator died on the 30th April, 1856, less than one calendar month after making the will. The Act of Assembly of 26th April, 1855, declares that " no estate, real or personal, shall hereafter be bequeathed, devised, or conveyed to any body politic, or to any person, in trust for *religious or charitable uses*, except the same be done by deed or will," " at least one calendar month before the decease of the testator or alienor, and all dispositions of property contrary hereto, shall be void and go to the residuary legatee or devisee, next of kin, or heirs, according to law." There is an exception in favour of *bona fide* sales for a valuable consideration. The English statutes against devises in mortmain did not extend to anything but *superstitious* uses. It was therefore held, that notwithstanding those statutes, a man might give lands for the maintenance of a school, hospital, or *any other charitable uses:* Porter's Case, 1 *Rep.* 24. But it was apprehended, from experience in England, that persons on their death-beds might make large and improvident dispositions, even for these good purposes, and defeat the political end of the statutes of mortmain. It was therefore provided by the statute of 9 George 2d, ch. 36, that " no lands or tenements, or money to be laid out therein, should be given for or charged with any charitable uses whatsoever, unless by deed executed twelve calendar months before the death of the donor." This statute has been uniformly construed by the English courts of law and equity so as to give it its full force and effect; and by no means to give way to those disgraceful subtleties which by degrees overturned the former mortmain acts. It has, in accordance with its true spirit, been construed to extend to lands devised to trustees, to sell them and convert the proceeds of sale to charitable uses, although not within the letter of the statute, which only embraced lands and tenements, or money to be laid

out in lands and tenements.   But to prevent fraud and evasion, it was extended by construction to the proceeds of land : 1 *Ves. sen.* 108 ; 2 *Ves. sen.* 52.   In the spirit of the statute of 9 Geo. 2d, ch. 36, and to prevent many of the mischiefs remedied by that statute, the Act of 26th April, 1855, was passed.   There may be some difference of opinion on the question of policy involved in its enactment ; but there can be no doubt that it is our duty to carry out its provisions in good faith.   This brings us to the question, Is the devise to the use of the West-Town School a devise for " charitable uses," within the meaning of the act ?   That school has been established by the members of the Society of Friends, is exclusively under their control, and is designed for the support and education of their children.   As a part of the education of the pupils, they are instructed in the principles of Christianity, as understood by that society.   Children, whose parents are unable to pay for their education, are provided for out of a fund raised by the society for the purposes of the school, through the liberality of contributors among its members.   The charges for boarding and education are less than the actual expenses incurred.   It is conceded that the immediate benefits of the institution are confined to the children of members of the religious society which has the management of it, and that they are not restricted to the education of the poor alone, but extend alike to the rich and poor.   It is also manifest that religious instruction is one of the objects of the school.   But it has never been held by any court in this Commonwealth, that a gift for a school ceases to be a gift for charitable uses, because religious instruction is combined with that of a literary and scientific character.   Nor has it ever been supposed in this country, that an institution established for the purposes of education is not a charity within the meaning of the law, because it sheds its blessings, like the dews of Heaven, upon the rich as well as the poor.   In Witman *v.* Lex, 17 *Ser. & R.* 91, there were two legacies, one for the *poor* of the Lutheran congregation, and one for the education of *young students* in the ministry of the German congregation under the direction of St. Michael's and Zion's Churches.   Both were sustained as good charitable uses. In Morrison *v.* Beirer, 2 *W. & S.* 81, a deed to a *school-house* and *congregation* was sustained as a gift for charitable uses.   In McKissick *v.* Pickle, 4 *Harris* 140, a deed for the use of the subscribers to the erection and support of a *school-house* and *meeting-house* for *public worship* was sustained as a valid gift for charitable uses.   In Wright *v.* Linn, 9 *Barr* 433, land conveyed for a school-house for the use of the parties to the deed, and the inhabitants residing nearer to that school than any other, and such other inhabitants as they might see fit to admit, was held a good gift for charitable uses.   In App *v.* Lutheran Congregation, 6 *Barr* 201, a gift of money to the Lutheran Congregation ; in

Zimmerman *v.* Anders, 6 *W. & S.* 208, a legacy to the "Schwenk-felder Society," a religious association of Montgomery county, for the poor of that society; and in the Methodist Church *v.* Reming-ton, 1 *Watts* 218, a gift to the members of the Methodist Episco-pal Church;—were held good gifts for charitable uses.  It is true that the gift last mentioned was defeated, because it was placed under the control of an organization of persons who were not citizens of the state, and who stood under the condemnation of our legislative policy against foreign corporations.  But in none of these cases was it supposed for a moment, that the gift failed or ceased to be for charitable uses, either because not restricted to the poor, or because confined in its benefits to a particular class, or because it was for the spread of religion, or because it combined all or any of these purposes together.  The statute of 43 Eliz. ch. 4, is not strictly in force in this state, on account of the inapplicability of its regulations, as to modes of proceeding.  But its conservative provisions have been in force by common usage and constitutional recognition; and not only these, but the more extensive range of charitable uses which chancery supported before that statute and beyond it: Zimmerman *v.* Anders, 6 *W. & S.* 218.  That statute, in its enumeration of charitable uses, mentions "schools for learning, free schools, and scholars in universities."  But it is well settled, that charity neither originated in this statute, nor is confined to its enumeration of objects: 1 *Conn.* 172.  Gifts for the benefit of the British Museum, 2 *Sim. & Stu.* 595; for the promotion of religion in whatever terms expressed, 4 *Ves.* 542, 2 *Sim. & Stu.* 67, 16 *Pick.* 107; and even for a school for the education of gentlemen's sons, Atty. Gen. *v.* Earl of Lonsdale, 1 *Sim.* 100;—have been sustained as good gifts for charitable uses.  Bequests to the "American Bible Society," to the "American Education Society," to the "American Colonization Society," and to the "American Home Missionary Society," have also been held good: 24 *Pick.* 146; 4 *Met.* 378; 7 *Smedes & Marsh.* 694; 15 *Conn.* 274; 7 *Vermont* 241.  If we were to attempt a definition which would embrace all gifts for charitable uses, we should adopt the language of the eminent patriarch of our profession, Mr. Binney, as expressed in his argument in Vidal *et al. v.* The City of Philadelphia : "whatever is given for the love of God, or for the love of your neighbour, in the catholic and universal sense—given from these motives and to these ends—free from the stain or taint of every consideration that is personal, private, or selfish," is a gift for charitable uses according to that religion from which the law of charitable uses has been derived.  "*The love of God* is the basis of all that is bestowed for His honour, the building up of His church, the support of His ministers, the religious instruction of mankind. *The love of his neighbour* is the principle that prompts and conse-

crates all the rest." " The currents of these two great affections finally run together, and they are at all times so near that they can hardly be said to be separated :" Girard Will Case, 54.

It is true there is a narrower sense in which the word charity may be understood. The benevolence which limits itself to giving alms to the poor comes within this restricted definition; but it falls far short of that true charity which has its origin in the two great sources of all good deeds—the love of God and the love of man. Instruction in useful knowledge is essential to the permanent comfort and happiness of mankind. Temporary relief in the hour of need is indispensable to the support of life. The diffusion of knowledge among the ignorant is a charitable gift to the destitute; and so is the dispensation of necessaries to the poor. The settled legal definition of a charitable use includes both these classes of charities. A charitable use is not always a religious one, but we know of no religious use, which could be recognised at all as free from superstition, that is not included in the definition of a charitable use. Instruction is not less a charity because it extends to that saving knowledge which is useful here and hereafter. And it is certainly no objection to such charities that they provide for the instruction of children in the Christian religion according to the views entertained by their parents. It is the duty of a parent to " train up a child in the way it should go." The divine and human law has imposed this duty on him, and his powers are necessarily commensurate with his duties. It is, therefore, clearly implied that he has the right to select such teachers, and to instil such religious sentiments as he believes, in the conscientious discharge of his duty, to be most conducive to the welfare of his child. A gift, which enables parents to perform their obligations in this respect, is certainly none the less a gift for charitable uses on that account.

It is true, that " the words in a statute are generally to be understood in their usual and most known signification, not so much regarding the propriety of grammar as their popular sense." But when terms of art or technical terms are used (and there is nothing in the statute to show that they were used in a restricted or popular sense), " they must be taken according to the acceptation of the learned in the art, trade, or science" to which they properly belong: 1 *Black. Com.* 60. In the section of the Act of 1855, in question here, there is nothing to show that the terms " charitable uses" were used in a restricted or popular sense. Nor can we fairly infer from any other part of the act that they were so used. We are, therefore, bound to understand them in their legal and technical signification. We have no doubt that they were so understood by the legislature, and that they were intended to embrace objects of a religious, literary, and scientific character, as well as those which related to the poor and afflicted. We *cannot*

[*Price et al. v. Maxwell et al.*]

close our eyes to the mischief supposed to exist, and which the Act of 1855 was intended to remedy. The object was to protect the heirs and next of kin from large and improvident dispositions by persons on their death-beds, or when their minds were enfeebled by the hopes and fears of approaching dissolution. Gifts to objects of a scientific or literary character were certainly as much within the mischief as any other gifts to charitable uses. To hold, therefore, that the legislature intended to lay a heavy hand only on gifts for the relief of the destitute, the afflicted, and the helpless, while donations for objects of a merely literary and scientific character were to be exempted from the restriction, would be doing great injustice to the benevolence and common sense of our lawmakers. In all cases where the validity of such devises has depended upon holding them to be for charitable uses, they have uniformly been sustained as falling within that description. Now, when a restriction has been imposed upon such devises, we are asked to evade the restriction by declaring that they are *not* for charitable uses. We cannot blow hot and cold in the same breath. We cannot, for the purpose of sustaining such a gift, declare it to be a good gift for charitable uses, and at the same moment, for the purpose of evading the provisions of the Act of 1855, hold that it is not such a gift. The argument which confines the statute to gifts for the relief of the poor and afflicted, if successful, would convict the legislature of an intent which would do violence to the most ordinary impulses of human nature. It says, in effect, that when the bereaved widow, the helpless orphan, and the wretched sufferer from disease, cry aloud from the depths of their poverty and distress for the relief which is absolutely necessary to sustain life, the policy of the state is to throw obstructions in the streams of charity which gush spontaneously from the hearts of the people; but when schools, academies, colleges, and universities seek for aid to educate children whose parents are able to educate them without such aid, or to advance " gentlemen's sons" in the learned professions, all obstructions are to be removed!—thus, accomplishments are preferred to the necessaries of life—the rich are exempt from the restriction, and the poor are stripped of the charity which benevolence would extend to them. We cannot adopt any such construction of the act. We cannot, even for the purpose of advancing the interests of a highly meritorious school, give the act such a construction as shall make it single out for its condemnation those charities which are the most urgent in their demands upon the humane, and which are especially commended by the Saviour himself: " I was an hungered and ye gave me meat, I was thirsty and ye gave me drink; I was a stranger and ye took me in; naked and ye clothed me; sick and you visited me; I was in prison and ye came unto me." It cannot be supposed that these were the especial objects of the legislative restriction.

[Price *et al. v.* Maxwell *et al.*]

The mischief, and, of course, the remedy extended to the whole range of gifts for charitable uses in the legal and technical sense of those terms. We are, therefore, compelled to hold that the Act of 1855 operates upon the gift to the Friends' Boarding School at West-Town. ·

The legislature sometimes render their meaning obscure in the effort to express it in such a way as to be free from doubt. In the fourth section of the act under consideration, we have the words, "society, church, association, or congregation;" but we are not to infer from this language that a "society" is not an "association," or that neither of these terms include a "congregation." So, in the seventh section, we have the words "bishop or ecclesiastic;" but we are not thereby bound to hold that a "bishop" is not an "ecclesiastic." If we allowed loose and inadvertent language in Acts of Assembly to change the well-settled meaning of terms, we should be afloat on a sea of uncertainty. We see nothing in the various Acts of Assembly cited, which can justify such a course. The terms "charitable uses," have become perfectly understood by the courts, the legislature, and the people, not only in this country, but in that from which we derive our language as well as our common law.

That part of the legacy which is directed to be applied to increase the salaries of the teachers, is in ease of the school, and is as much for its use as any other part of the gift. It is like the legacy to a Roman Catholic priest and his successors, which was held to be in ease of the congregation, and therefore for its benefit: McGirr *.v.* Aaron, 1 *Penn. Rep.* 49.

If the will of 1856 contained no express clause of revocation of all former wills, a question might arise whether the will of 1841 was revoked by the devise afterwards made. Where there are two wills, in some respects inconsistent, the latter revokes the former only so far as they are inconsistent with each other, *unless there is an express clause of revocation: Jarman on Wills* 159. Where the second will is styled a codicil, or appears to have been intended for one, it is the duty of the court to construe them together as constituting one will; and in such case, the revocation by implication will only take place where there is a clear inconsistency, and then only to the extent of that inconsistency. Even in the case of a codicil, an express revocation of a former will must have its legitimate effect. But in the case before us, the property given to the school in the first will, is included in a general devise in the second will of all the testator's estate to the same institution. There is, therefore, a manifest inconsistency, showing that there was no intention that both wills should stand. The same thing is apparent from the appointment of new executors. But it is not necessary to regard these circumstances, because we have an express clause of revocation in the will of 1856, and that clause

[Price *et al. v.* Maxwell *et al.*]

is not in any respect avoided or impaired by the Act of 1855. It stands in full force. The result is, that the will of 1841 is revoked.

But it is contended that this revocation was made upon condition that the devise to the school in the will of 1856 should take effect. How do we know this? *Perhaps* the intention to make the new disposition, induced the revocation of the old; and, *perhaps,* the new disposition was only the result of a pre-determination to revoke the old. There is nothing to lead the mind with anything like logical certainty to the deduction that either was the result of the other; and it is very clear that the heirs at law are not to be disinherited upon a mere peradventure. We have no right to add conditions not expressed by the testator, nor implied from his acts. He had it in his power to make conditions, but he made none, and we can make none for him.

The rule in regard to revocations arising from inconsistent dispositions, seems to be, that where the second devise fails by reason of a defective execution of the second will, it is no revocation of the first: *Jarman on Wills* 154; but where it fails from want of capacity in the devisee to take, the prior devise is revoked: French's Case, 1 *Roll. Abr.* 614, pl. 5; Roper *v.* Radcliffe, 10 *Mod.* 230; 8 *Vin. Abr.* 141, tit. *Devise, R.* 3; Laughton *v.* Aikins, 1 *Pick.* 535; Ellis *v.* Smith, 1 *Ves. jun.*; 17 *Jarman* 154; Jones *v.* Murphy, 8 *W. & S.* 300. Mr. Justice ROGERS, in the case of Jones *v.* Murphy, stated the rule correctly, when he held, that if the second will was properly executed according to the statute, though it should be prevented from operating by the incapacity of the devisee, or any other matter *de hors* the will, the former will is, nevertheless, revoked by it: 8 *W. & S.* 300. On this principle, it has been held, that a devise to the poor of a parish—to a corporation incompetent to take—to a Papist prohibited by statute—or to the heir at law who takes by his better title (although in each case the devise is void), is nevertheless a revocation of a previous devise to a person competent to take. The case of Roper *v.* Radcliffe was in every essential particular like the present. It was a devise to two Papists, which was declared by the statute of Eleventh and Twelfth W. 3d, "utterly void." It was nevertheless held to be a revocation of a previous devise. This was the unanimous opinion of Lord Chancellor HARCOURT, Chief Justice PARKER, of the King's Bench, Chief Justice TREVOR, of the Common Pleas, POWELL, Judge of the King's Bench, and Sir JOHN TREVOR, Master of the Rolls. There was an appeal to the House of Lords, on other points, but that part of the decree was not controverted in the House of Lords, and was approved of by the counsel on both sides: 10 *Mod.* 233.

But independent of the general rule, the Act of 1855 disposes of this question. It expressly declares that the " dispositions" to " charitable uses," shall " go to the residuary legatee, devisee,

next of kin, or heirs according to law." This clause excludes all idea of permitting the property to pass under any former will. It is not pretended that it passes to the residuary legatee under the will of 1841. There is no residuary legatee or devisee under the will of 1856. The result is, that the property goes, according to the express direction of the Act of Assembly, to the next of kin, or heirs according to law.

It is therefore declared that the dispositions in the will of Thomas Smith, of the 10th April, 1856, to Ebenezer Maxwell and Joseph Scattergood, executors, for the uses and purposes of Friends' Boarding School at West-Town, are void; and, that the said executors are seised and possessed of the real and personal estate of the said Thomas Smith, deceased, in trust for the purposes of paying the funeral expenses and debts of the said decedent, and distributing the residue among the heirs and next of kin of said decedent.

The decree of the Court of Nisi Prius, dismissing this bill, is reversed, and it is here decreed that the said executors settle their administration account, and distribute the funds which may remain in their hands, after payment of debts, funeral expenses, and charges of administration, under the direction of the proper Orphans' Court, and in conformity to the principles indicated in this opinion.

It is further ordered that the said executors pay the costs of this suit, and that they be allowed to charge the same, together with their reasonable expenses, in the settlement of their said administration account.