## Good Estate

*Candor, Youngman & Gibson; Furst, McCormick, Muir, Lynn & Reeder; Albert W. Johnson, Jr.,* and *Henry M. Hipple,* for appellants.

*Markin R. Knight* and *James T. Smith,* for appellee.

LIPEZ, P. J., December 16, 1963.—This is an appeal from the decision of the register of wills admitting to probate a writing dated February 15, 1961, as Hus-

ton E. Good's last will and refusing to probate a writing dated February 12, 1947, as his last will. The appeal is by certain of beneficiaries under the 1947 writing.

Good was a member of the Lycoming County Bar, as well as a certified public accountant. He had practiced neither profession for many years prior to his death at the age of 70 on March 5, 1962, devoting his time entirely to farming. Though married at one time and divorced, he had no children, leaving only collateral heirs. He lived alone on one of a number of farms he owned, and was described as odd and eccentric, though well read and intelligent.

Shortly after his death, Roy L. Bryerton, Clinton County Coroner, found in a writing desk in the kitchen of decedent's farmhouse in Pine Creek Township, Clinton County, a piece of cardboard on which there appeared in his handwriting the following:

"My Will

My farms, etc., I
leave to those who
can take them.

My remains take the
scars and bumps
acquired in caring
for the farms.

If I may have inspired
anyone to cherish the
good earth during my
lifetime, we take this
with us.
                    Huston E. Good
Avis, Pa.          Feb. 15, 1961"

This document was probated as his will on March 22, 1962, and letters of administration were issued to Bessie Parks Wurster, a cousin and one of numerous collateral heirs. It is from the probate of this writing as a will, and the refusal to admit to probate a carefully

drawn will of 1947 [1] as his last will, which is the subject of this appeal.

Is the 1961 document a will? Does its language qualify under the Blackstone definition as " 'The legal declaration of a man's intentions, which he wills to be performed after his death' ": Burtt Will, 353 Pa. 217, 221. In ascertaining that intention it is not our province to consider what he possibly intended, but only his intention as expressed in the language used: Gibson v. McBurney, 399 Pa. 195. It is where the intention is ambiguously expressed that difficult problems arise. If it is so indefinite and uncertain as to be incapable of intelligent interpretation and enforcement, it is void: 40 P. L. Encyc. Wills §83.

The document has only a superficial resemblance to a will. Though it is designated "My Will," when we attempt to determine the meaning of "my farms, etc. I leave to those who can take them" we are completely frustrated. Proponents say this means that it goes to those who can take by descent; that is by operation of law to those heirs who would be entitled under the intestate laws. Passing the question of what is covered under "my farms, etc.," there is nothing in the docu-

---

[1] It is set out in full in the appendix. Briefly summarized, after various bequests of personal property, he devised his real estate as follows: the farm on which he resided, lying North of the N. Y. C. R. R. tracks in Pine Creek Township, Clinton County, to his father for life, and thereafter to Wayne Carson; the balance of his real estate in Pine Creek Township, Clinton County, to Glynn Krise; and his farm situate in the 7th and 11th wards of Williamsport to Marguerite T. Slate. He gave the residue of his estate to Anna Blanche Slate and Martha Virginia Slate as joint tenants with right of survivorship, subject to a monthly payment of $30 per month to his father, and appointed Glynn Krise and Anna Blanche Slate as executors.

His father died sometime in 1950.

This will was kept in a bank deposit box of the Slates.

The appeal here is by Wayne Carson, Anna Blanche Slate and Martha Virginia Slate.

ment itself which aids us in determining the identity of the "those who" referred to in this clause, nor the meaning of the crucial word "take". When we resort to the doubtful, especially in will cases, expedient of ascertaining the dictionary definition of a word of such common usage as "take", we find it is susceptible of many meanings. Webster's Third New International Dictionary (unabridged-Merriam Webster), devotes over three page-length columns to definitions and applications, practically all of which are dependent on the manner of its use since the word in itself has little intrinsic meaning. In 83 C. J. S., this succinct summary appears: "The word 'take', which comes from the Scandinavian root meaning to grasp, grip, seize, lay hold of, is considered to be one of the commonest and plainest in the English language . . . it does have many shades of meaning, and the precise meaning which it is to bear in any case depends on the subject with respect to which it is used."

Essentially the correct meaning of a word [2] is determined by the particular context of its use. This is especially true of one so general in its nature and so devoid of specific connotation as "take". To import into it the meaning of take by descent, or by operation of law would be, in our judgment, not only an unwarranted extension of its meaning, but would constitute an interpolation for which there is no justification in the context in which it appears.

We must conclude, therefore, that whatever may have been in testator's mind, his intention is so vaguely and obscurely stated in the 1961 document as to be void for uncertainty: Wise v. Rupp, 269 Pa. 505. In Re:

---

[2] Note the luminous language of Justice Holmes in Towne v. Eisner, 245 U. S. 418, 425, 62 L. Ed. 372, 376 (1918): "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."

Womack's Estate, 253 Pa. 384; Kelley v. Kelley, 25 Pa. 460; Restatement, Property §248.

Proponents, however, contend that assuming the 1961 writing is determined not to be a will, nevertheless, it should be considered as an "other writing" under section 5 of the Wills Act of April 24, 1947, P. L. 89, 20 PS §180.5, which impliedly revokes the 1947 will in part at least. They say that testator's intent to revoke his prior will is shown by the testimony of their witness, Mrs. Bessie Wurster, and a letter she received from him. She testified that several days before November 23, 1949, Good talked to her about settling his estate. Shortly thereafter she received a letter from him, dated November 23, 1949, wherein he stated in the last paragraph, "Bessie I made a will since I saw you. It contains nothing that obligates you in any way. But thought something could happen and I wanted some changes made. This will is in a little wooden box in the bureau drawer in the middle bed-room." This evidence, say the proponents, along with the 1961 writing, which refers particluarly to "my farms etc.," constitutes a revocation at least as to the farms and whatever else the "etc." [3] might be construed to mean.

It is true, of course, that there may be revocation by another writing of any sort, provided it is executed in the manner required of wills, even though the instrument may not be capable of probate as a will: Kehr Will, 373 Pa. 473; Bregy "Intestate, Wills and Estates Acts of 1947," p. 2361. The revocation may be either express or implied and the principles governing revocation by an other writing are similar to these governing revocation by a later will: Bregy, supra.

Obviously, there is no express revocation here. The most that can be said for the testimony is that testator

---

[3] The syllabus on Fleck v. Harmstad, 304 Pa. 302, states: "The symbol '&c.' and the expression 'etc.' are used in indicating things of like character with things enumerated just before them."

may have made another will in November, 1949, with "some changes." While it may have been evidence of an intention to revoke the 1947 will by a will in 1949 to the extent of the "some changes," since no such will was produced, there was, therefore, no act of revocation by a writing declaring a revocation: Shetter's Estate, 303 Pa. 193. Furthermore, this evidence clearly referred to a supposed 1949 will, and as such, is not applicable to the 1961 writing.

Even if we should stretch the intention here as a carry-over until 1961, we run into the problem of vagueness again as to the meaning of the clause referring to "my farms etc.," which we previously discussed. In any event, the 1961 clause instead of being inconsistent with the 1947 will, which is the requisite for implied revocation, Gray Will, 365 Pa. 411, actually is consistent with it, for it is only by reference to the disposition of the farms in the 1947 will that we can understand what testator meant by "those who can take them."

We are also convinced that even if the 1961 writing is of a testamentary character, the 1947 writing would still be entitled to probate. This would be true, whether the 1961 document is considered as either a codicil or a will.

In Bingaman's Estate, 281 Pa. 497, the court treated what its maker called a will, as a codicil, stating that, page 507, "If it is 'some addition to, or qualification of, a last will and testament' . . . it speaks as a codicil, whatever name the testator may have given to it." See also Price v. Maxwell, 28 Pa. 23, 38. If it is an inconsistent codicil, then "insofar as the provisions are antagonistic to the will, the changes are to be enforced": Hunter's O. C. Common Place Book, vol. 1, p. 247. The only possible antagonistic clause in the 1961 writing is the one in question. As a codicil it should be construed, if possible, consistent with the will; and if it is subject to two interpretations, one of which is consistent with

the main purpose of the will and the other is not, the consistent one must be adopted: Raineer's Estate, 304 Pa. 539. Clearly the only consistent one would be a construction that the "farms, etc." go to these mentioned in the 1947 will.

Considering the 1961 document as a will, construing it in relation to the 1947 will, we arrive at the same result. The applicable governing principles are: (1) The mere making and execution of a later will, containing no express words of revocation, does not revoke an earlier will, unless it is inconsistent with the earlier one: 59 A. L. R. 2d 11, 28. (2) A later will disposing of part of the estate inconsistently with the earlier will, will revoke it only to the extent of the inconsistency, and both are to be admitted to probate: 59 A. L. R. 2d 45; Turner Estate, 408 Pa. 530; Price v. Maxwell, 28 Pa. 23. Here again, if there is any inconsistency between the two documents, it is only as to "my farms etc.," and here again there is a manifest consistency between the two documents because by reference to the 1947 will we are able to determine those who can take the "farms, etc."

We arrive at the same result when we consider the nature of the ambiguity in the 1961 document. If considered as patent ambiguity, i.e., one which arises on the face of the will: Iddings v. Iddings 7 S. & R. 111, Restatement, Property §242 J; parol evidence is not admissible to explain it; but, if it is a latent ambiguity; i.e., one which is revealed only by facts extrinsic to the language of the will: Logan v. Wiley, 357 Pa. 547; parol evidence is admissible.

If it is a patent ambiguity as we believe it is, the 1961 writing fails. If it is a latent ambiguity, the only evidence is the 1947 will,[4] which, as we have heretofore

---

[4] Even a revoked former will is admissible for such purposes: 57 Am. Jur., Wills §1107; Galli's Estate, 250 Pa. 120; Nelson's Estate, 147 Pa. 160; Hirst's Appeal, 92 Pa. 491.

indicated, clarifies the ambiguity, and would simply mean that the estate would go under the 1947 will.

Thus, whatever approach we take, we arrive at the same result. The 1961 writing, standing alone, disposes of nothing, and, when considered in conjunction with the 1947 will, it neither adds to, detracts from, or changes anything therein.

One could indulge in considerable speculation as to decedent's motivation in writing such an enigmatic document. As a lawyer, competent to write a carefully prepared, well drawn will, as demonstrated by the technically correct 1947 will, it is quite likely that he did not intend the 1961 writing to be a will. Living alone on a farm, in unkempt quarters without conveniences, though a man of substantial means, written on the seventieth anniversary of his birth, this effort at blank verse seems to be more in the nature of a lonely old man's outburst of his emotional attachment to the land for which he had given up a professional career, rather than an attempt to dispose of property. His was a fervent love of the soil, and his off-hand reference to his farms would indicate that his concern was not with their ownership after his death, but rather, to inspire others "to cherish the good earth"; his concern was not as to their material possession, but only to convey his deep feeling for the soil. This, we believe, is what he meant by "My Will." And he chose for that purpose language which is strangely reminiscent of these lines from Bunyan's Pilgrim's Progress:—

"My sword I give to him that shall succeed me in my pilgrimage, and my courage and skill to him that can get it. My marks and scars I carry with me, to be a witness for me, that I have fought His battles who now will be my reward." [5]

---

[5] Quoted from A New Dictionary of Quotations, selected and edited by H. L. Mencken (Knopf, 1942), page 1186.

The problem involved here is one of probate: Rockett Will, 348 Pa. 445. The probate of the 1961 writing as a will was error and should be set aside; and the will dated February 12, 1947, should be admitted to probate and letters issued thereon.

### Order

And now, December 16, 1963, the within appeal is sustained, the probate of the writing dated February 15, 1961, is set aside, the letters granted to Bessie Parks Wurster are revoked, and the register is directed to admit to probate the will dated February 12, 1947, and issue letters thereon.