## Miller *et al.* versus Porter *et al.*

1. The statutes of mortmain are extended to this state only so far as they prohibit dedications of property to superstitious uses, and grants to corporations without a statutory license.

2. Where the conveyance is to no ecclesiastic or church or church school or hospital, for the promotion of religion in any of its forms, or by means of any of its appliances, it is not a religious use.

3. In law "religious and charitable uses" mean legal acts done for the promotion of piety among men, or for the purpose of relieving their sufferings, enlightening their ignorance and bettering their condition; such acts courts of equity uphold and effectuate according to the intention of the donor, *pro salute populi.*

4. A bequest "to be expended in the purchase of a lot and the erection of a college or university with library rooms, &c., * * together with my library and $6000 additional to be expended in the purchase of useful books for the library, and it is my wish that the said college be known as the Porter University or College," is a charitable use and, having been made within a month of the testator's death, is void by section 11 of Act of April 26th 1855.

APPEAL from the decree of the Court of Common Pleas of *Allegheny county*, in Equity, by Benjamin Miller and others, executors and trustees under the will of John M. Porter, deceased, respondents below; John Porter, Sr., and others, the next of kin and heirs at law of the decedent, being the appellees and complainants below.

John M. Porter, the testator, died on the 3d of December 1865, having made his will on the 30th of November in the same year. By his will, besides other legacies and devises, he gave as follows: "I also give and bequeath the sum of $50,000 to be expended in the purchase of a lot or lots, and the erection of a college or university with library-rooms, &c., to be located in or near Tarentum, together with my library, and $6000 additional to be expended in the purchase of useful books for the library, and it is my wish that the said college or university be known as the Porter University or College. And I do hereby appoint Rev. Joseph Horner, R. S. P. McCall, Rev. W. W. Roup, Rev. George Ormond, W. V. Evans, John A. Miller and John F. Humes, trustees to purchase said lot or lots, and for the erection of the buildings, procuring a charter and library, with the general management of the whole concern, with power if necessary to add to their number, and devise suitable ways for the election or appointment of their successors.

⁂          ⁂          ⁂          ⁂          ⁂          ⁂          ⁂

[Miller v. Porter.]

"It is my wish and intention and I also direct, that after my real estate is sold and conveyed, the several bequeathments by me made from my estate paid, that there be a proportionate amount expended in the further improvement of the cemetery lots before mentioned, and also a proportionate amount expended in the college or university buildings, library, &c.

"Also I direct, that after the death of the said N. J. P. McCall, the house and lots bequeathed to her for and during her natural life, be sold and conveyed by my executors, the proceeds of such sale be applied to the benefit of the said college or university, including the library in and for the use of said university."

After the testator's death, an Act of Assembly was passed— April 3d 1866—reciting the devise, and incorporating the trustees named in it, as the "*Porter University of Tarentum*," with power "to grant and confer such degrees in the liberal arts and sciences or branches thereof, to such students or graduates of the university, or other persons, as they may deem justly entitled to such honors, and such as are usually granted by universities and colleges to persons of either sex; and to grant diplomas or certificates under their common seal, as may authenticate and perpetuate the memory of the degree so conferred, and generally do every other thing or act necessary to carry into effect the provisions of this act, and to promote the objects and design of said corporation: Provided, That the net annual income of said corporation shall not exceed the sum of $15,000, exclusive of the income from students: Provided also, That the trustees, or their successors, as aforesaid, shall have no power to put or place the said university under the patronage, control, direction, or in possession or management as the property, or for the use, in whole or in part, of any religious denomination or denominations, church or churches, sect or sects, as such, nor shall ever in any way be constituted, construed or deemed to be denominational or sectarian institution, or be at any time or in any way transferred, aliened, made the property in fee simple or otherwise, in whole or in part, of any church or churches, or religious denomination or denominations, sect or sects, as such, or be in any way whatever placed in subjection or subordination thereto as such.

"The objects and design of said corporation shall be the erection of a suitable building or buildings as they may determine therefor, and the establishment of a university within the limits of the county of Allegheny, in or near the borough of Tarentum, in which are to be taught the various branches, elementary and advanced, of science, literature, modern and ancient languages, and all the various branches of education, to the extent and in the manner and to the persons that may from time to time be determined on by the said corporation, and as the same may be

set forth in their constitution, by-laws and regulations as afore-said.

\*        \*        \*        \*        \*        \*        \*

" The executors of said will of John M. Porter, Esq., be and they are hereby directed to pay over, from time to time, all moneys in their hands devised for the uses and purposes of said university, to the said trustees and their successors, and their receipts given in the form by them directed, shall be good and sufficient vouchers for said executors in the settlement of their accounts."

On the 29th of January 1866, John Porter and others, next of kin and heirs at law of the testator, filed a bill against the executors and trustees under the will, averring that the devises being for charitable uses were void, and that the respondents were procuring an Act of Assembly to validate the devises ; and praying that " the executors be decreed to account to the heirs and next of kin of John M. Porter, for the estate devised or bequeathed as aforesaid,    \*    \*    and that they be enjoined from paying over to said trustees any portion of the estate," and for general relief.  A plea and answer were filed raising mainly the question, whether the devises were for " charitable uses," within the Act of April 26th 1855, § 11, Pamph. L. 332.  The cause was heard on bill, plea and answer.

On the 12th of September 1866, the court below decreed :—

1. That the devises made in the last will and testament of John M. Porter, deceased, for the purchase of a lot or lots, and the erection of a college or university, with library-rooms, &c., to be located in or near Tarentum, and for the purchase of books, being for charitable uses, and having been made by will less than one calendar month, to wit, four days before the decease of said testator, contrary to the Act of Assembly of Pennsylvania, entitled " An act relating to corporations and to estates held for corporate, religious and charitable uses," approved April 26th 1855, are unlawful and void.

2. That the executors named in said last will and testament of John M. Porter, deceased, defendants in this suit, shall account for and pay over to the heirs and next of kin of John M. Porter, deceased, all moneys and property, so as aforesaid devised for the uses and purposes of the said college or university and library, and that they, the said executors and trustees named in said last will and testament (defendants in this suit), be and they are hereby enjoined and restrained from paying, applying or appropriating any moneys or property of the estate of the said John M. Porter, deceased, to and for the uses and purposes of the said college or university and library, or to and for the uses and purposes of " Porter University," incorporated by an Act of Assembly of the Commonwealth of Pennsylvania, entitled " An act to incorporate

[Miller v. Porter.]

Porter University of Tarentum, in the county of Allegheny," approved the 3d day of April, A. D. 1866.

3. That the said executors of said will of John M. Porter, deceased, be and they are hereby enjoined and restrained from paying to the trustees named in said will (defendants in this suit), any portion of the estate of said decedent, and that the said defendants do pay to the said plaintiffs their costs of this suit, to be taxed by the prothonotary."

This decree was assigned for error.

*S. A. & W. S. Purviance, Hamilton & Acheson* and *A. M. Watson*, for appellants.—The Act of April 26th 1855, in most of its sections, prescribes rules for religious, charitable and literary institutions: the 11th section, embracing the prohibitory ban, applies only to "religious and charitable" institutions, omitting "literary institutions." The omission was designed to relieve literary institutions from the restrictions imposed on others. The law was intended to operate as a statute of mortmain, to defeat bequests made to the clergy for superstitious uses. The statute of 43 Elizabeth exempted "schools of learning, free schools, and scholars of universities."

Before our Act of 1855, gifts were sustained as charities, under the doctrine of *cy pres*, to prevent failures in carrying out the intention of donors. It is true a literary institution may be so intermixed with religion and charity, as to lose its identity as a purely literary organization: Price *v.* Maxwell, 4 Casey 23. Where a grant is free from the taint of personal advantage, it is a charity: Binney *arguendo*, Girard Will Case, 2 Howard 127. But this bequest is for the personal, but worthy, pride and ambition of the testator, to perpetuate his name and memory. No part of this gift was for gratuitous education, for the salary of teachers, or for the poor.

The word "literary" in the act, was intended to embrace universities, colleges, academies and schools; it would be a stretch of construction to draw within the term "charitable" the bequest for the Porter University.

The corporation created by the legislature in reference to this gift, is a civil corporation, being for the advancement of learning: Angell & Ames on Corp. 28, 29; 1 Bl. Com. 471, 472; 1 Kyd on Corp. 26. A college founded by private benefactors for the distribution of private contributions is eleemosynary: Dartmouth College *v.* Woodward, 4 Wheat. 542.

In the Porter University the trustees can do nothing but buy grounds, erect buildings, and purchase a library: it is, therefore, not eleemosynary. To make it eleemosynary the charity must be the object, not an incident; the consequence direct, not remote: Attorney-General *v.* Hewer, 2 Vern. 387; Morice *v.* Bishop of

Durham, 9 Ves. 399; s. c. 10 Id. 522; Doe *v.* Copestake, 6 East 328; Babb *v.* Reed, 5 Rawle 151; Hinde *v.* Bishop of Chester, Cro. Ch. 239; Kirk *v.* King, 3 Barr 436; Doe d. Thompson *v.* Pitchey, 6 Taunt. 359.

The testator must either specifically declare the bequest to be a charity, or must so specify the object and bring it within what a Court of Chancery has decreed to be a charity, otherwise it is not to be so considered. Nothing in this will comes within those principles.

The counsel cited also the Religious Society Act of 1731; Act of February 17th 1717, 1 Sm. Laws 43; Act of April 6th 1761; Act of February 12th 1850, § 31; Act of May 8th 1850, § 32, Purd. 43; Id. 819, pl. 3; Id. 107, pl. 15–22.

*A. M. Brown* and *T. M. Marshall,* for appellees.—In England a college or university is a charity: Bright. Eq. Ch. 21, § 399. The stat. 43 Eliz. c. 4 provided for the protection of charitable uses; it did not create them: 2 Kent's Com. § 287–88, and note, p. 342; 1 Rose Will. N. Y. 78, 79; Tiffany & Ballard's Law of Trusts 232–33; Magill *v.* Brown, Bright. R. 347; Zimmerman *v.* Anders, 6 W. & S. 220. The statute 9 Geo. 2, c. 36, from which our statute is modelled, recognises " universities, colleges and houses of learning" as charities. In England a school for gentlemen's sons is a charity: Attorney-General *v.* Lonsdale, 1 Sim. 109. The principles adopted by chancery, obtain here as part of *our* common law: Witman *v.* Lex, 17 S. & R. 91; Wright *v.* Linn, 9 Barr 435; Morice *v.* Bishop of Durham, 9 Ves. 399; Martin *v.* McCord, 5 Watts 493; Stallman's Appeal, 2 Wright 203; Morrison *v.* Beirer, 2 W. & S. 86; Barr *v.* Weld, 12 Harris 84; Pickering *v.* Shotwell, 10 Barr 26, 27; City of Phila. *v.* Bicknell, 11 Casey 125; McGirr *v.* Aaron, 1 Penna. R. 49; Cresson's Will, 6 Casey 425; Cresson's Appeal, Id. 438, 450; Pepper's Will, 1 Pars. 450; Thomas *v.* Ellmaker, Id. 98; McLain *v.* School District, 1 P. F. Smith 196.

A remedial statute must be construed in view of the old law, the mischief and the remedy: Dwarris on Stat. 694, 695. The mischief to be remedied was the weakness of death, seeking to live in name by founding universities and popular institutions. The argument, from the omission of "literary" in the 11th section, was met by the opinion of the court in Price *v.* Maxwell, 4 Casey 23; McLean *v.* Wade, 5 Wright 266. " Charitable use" has a definite meaning in law; and technical words used in a statute must receive a technical construction: Sedgwick on Stat. 261; U. S. *v.* Jones, 3 W. C. C. R. 209; Fleming *v.* Insurance Co., Bright. R. 106; Dwarris 696.

The opinion of the court was delivered, January 7th 1867, by

WOODWARD, C. J.—John M. Porter, of Tarentum, Allegheny county, died on 3d December 1865, having made his last will on the 30th November 1865. After several specific bequests, he bequeaths " $50,000 to be expended in the purchase of a lot or lots, and the erection of a college or university with library-rooms, &c., &c., to be located in or near Tarentum; together with my library and $6000 additional, to be expended in the purchase of useful books for the library; and it is my wish that the said college or university be known as the Porter University or College." By a subsequent clause, he directed that after the sale of his real estate a proportionate amount of the proceeds be " expended in the college or university buildings, library, &c." He appointed seven trustees to take the title to the college lots, to erect the buildings, procure a charter and a library, and to have the general management of the whole concern, with power to add to their number and to provide for the appointment of successors.

The trustees procured a legislative incorporation of the Porter University of Tarentum; and the executors of the will were by said act directed to hand over to said trustees the moneys bequeathed to the university. The heirs at law thereupon filed their bill in equity claiming the funds, and praying that the executors and trustees be enjoined from proceeding further to execute the trusts in respect to the Porter University, on the ground that the devise is void, being for a charitable use and within the prohibition of the 11th section of the Act of 26th April 1855, Purd. 1018.

The 10th section of this act relates to and regulates dispositions of property made for " *any religious, charitable, literary or scientific use.*" The 11th section declares, that no estate, real or personal, shall be bequeathed, devised or conveyed to any body politic or person in trust for " *religious or charitable uses,*" except the same be done by deed or will at least one calendar month before the decease of the testator or alienor. The 12th section comes back again to " *religious, charitable, literary or scientific*" uses and trusts, and further regulates them.

If the phraseology of the 10th and 12th sections had been retained in the 11th, there would be no question here, for the money given to the Porter University would have been, beyond all doubt, for " literary and scientific" uses; but as it is only the 11th section which avoids the devise if made within a month before the death, the question is whether the devise to the Porter University was for a " religious or charitable" use. And this is the only material question upon the record.

It cannot be considered a " *religious*" use, for although among the seven trustees named by the testator there are three clergymen, no special jurisdiction is given to them, or to the religious

[Miller *v.* Porter.]

bodies which they represent, over the trust; and no purpose or design is expressed by the testator that has any more reference to religion than to commerce or agriculture. It was to be a college or university—a seat of general secular learning, or a school for all the learned professions. We get our legal ideas of religious uses from the mortmain statutes, which were introduced in England to check the ecclesiastics of the Romish Church from absorbing in perpetuity, in hands that never die, all the lands in the kingdom, and thereby withdrawing them from public and feudal charges, or as Lord Brougham expressed it in Giblett *v.* Hobson, 3 Myl. & K. 517, placing them "*extra commercium*." The statutes of mortmain have been extended to this state, only so far as they prohibit dedications of property to superstitious uses, and grants to corporations without a statutory license. An age whose prevalent spirit was commercial rather than religious, would naturally regard with jealousy all religious corporations and houses who held property in perpetuity, and pronounce against them as superstitious uses; but where the conveyance is to no ecclesiastic, or church, or church school, or hospital, or for the promotion of religion in any of its forms, or by means of any of its appliances, it cannot be considered a religious use.

The question in this case is, then, was it a devise for a charitable use? We have had two cases under this statute, the first of which was Price *v.* Maxwell, 4 Casey 23, in which a devise to a school, the West Town, under the auspices and control of a religious denomination or sect—the Friends—and in which the peculiar views of Christianity entertained by that denomination constituted a part of the instruction, was held to be a devise to a charitable use.

The other one was McLean *v.* Wade, 5 Wright 266, where the devise was to the "Associate Congregation of Shenango," a religious body, and it was held to be both a religious and a charitable use within the meaning of the statute.

It must be admitted that these cases are broadly distinguishable from the case in hand, for there both the religious and charitable purposes were strongly impressed upon the donation, and here they are not. We have said already that the devise was not to a religious use, and if we take Mr. Binney's exposition of charitable uses in the Girard Will Case, which Judge Lewis followed in his very able opinion in Price *v.* Maxwell, it is difficult to see how this devise can be considered any more a *charitable* than a *religious* use. "Whatever," said Mr. Binney, " is given for the love of God, or for the love of your neighbor, in the catholic and universal sense—given from these motives and to these ends, free from the stain or taint of every consideration that is personal, private or selfish," is a gift for charitable uses. "The love of God is the basis of all that is bestowed for

[Miller *v.* Porter.]

His honor, the building up of His Church, the support of His ministers; the religious instruction of mankind. The love of his neighbor is the principle that prompts and consecrates all the rest. The current of these two great affections finally run together, and they are at all times so near that they can hardly be said to be separated."

If so exalted motives as these prompted Mr. Porter to found a university, an ambition (not unworthy of himself) dictated that it should bear his name down to posterity, and ambition is a selfish passion, which, according to the definition, would take away the charity of the deed. If an act to be a charity must, indeed, be free from *any* taint of selfishness, very much that passes under the name is spurious, whilst the genuine article is so extraordinary a virtue that we ought not to wonder that an inspired Apostle ranked it above the christian graces of Faith and Hope.

But though the founding of a school of learning to perpetuate one's name may not come up to the abstract idea of a christian charity, our question is whether courts of justice, and especially this court, have not always treated it as a charity. The arguments of the learned counsel invite us into a wider field of inquiry than I shall enter, for it is a question of authority, and the result of the authorities may be very succintly stated.

The statute of 43 Eliz. c. 4, is the statutory foundation of charitable uses in England, and it embraced schools of learning, free schools and scholars in universities, excepting the colleges of Westminster, Eton and Winchester.

But this statute was not extended to Pennsylvania, though its principles have been often recognised and declared to be part of our common law: Witman *v.* Lex, 17 S. & R. 91; Zimmerman *v.* Anders, 6 W. & S. 220; Pickle *v.* McKissick, 4 Harris 148; s. c. 9 Id. 232.

In the bequests upon which these adjudications were founded the religious element was apparent which is wanting in our present case. We get nearer to our proper question, therefore, when we consider the following cases. Martin *v.* McCord, 5 Watts 493, was a case in which ground was given for a schoolhouse if the neighbors would go on and build a decent schoolhouse for the benefit of the neighborhood, and particularly for the benefit of the donor's grandson whom he wished to send to school. The donees were held to be trustees for the neighborhood, and, like all other trustees for charitable uses, subject to the supervision and control of the courts. In Morrison *v.* Beirer, 2 W. & S. 83, a conveyance was to a certain schoolhouse and its congregation or employers thereof, and though held insufficient to pass the legal title, it was supported as an equitable trust. Then came the case of Kirk *v.* King, 3 Barr 440, in which a conveyance to the " employers of a certain school" to hold the same for an " English

[Miller *v.* Porter.]

schoolhouse, and no other purpose," was held not a charity, principally on the ground that "charities are permanent foundations, which can scarce be predicated of country schools under the voluntary system." Wright *v.* Linn, 9 Barr 433, is a full and exhaustive opinion by the late Judge Bell, in which Kirk *v.* King is criticised and substantially overruled, and several leading English cases are discussed. The grant was to trustees and their successors of ground for a schoolhouse for a public school for the "benefit of the surrounding neighborhood, not only for the present generation, but to continue in perpetual succession for ever;" and it was held to be a charity which was not divested by non-user for more than seventeen years, and the re-entry of the grantor. In Pickering *v.* Shotwell, 10 Barr 23, a fund was appointed for the "distribution of good books among poor people in the back part of Pennsylvania, or to the support of an institution or free school in or near Philadelphia;" and, notwithstanding the equivocal terms of the grant, it was held sufficiently certain for a charity; C. J. Gibson, who had delivered the opinion in Kirk *v.* King, declaring that in "Pennsylvania such a bequest would not be the less charitable though the books were scientific." In Barr *v.* Weld, 12 Harris 84; City of Philadelphia *v.* Bicknell, 11 Casey 123; and Stallman's Appeal, 2 Wright 203, dedications for school purposes were treated as charities.

But the most comprehensive case in our books is Cresson's Appeal, 6 Casey 437. There a legacy to the city of Philadelphia to be "annually for ever expended in planting and renewing shade-trees," and a bequest to the Pennsylvania University "to endow a professorship of the fine arts," and a bequest to the Pennsylvania Agricultural Society "to be applied towards the erection and support of an agricultural college within the state," and a bequest to "the Refuge of Decayed Merchants," were all supported as charities.

These were, each and all, secular uses, in which, as in the instances of the schoolhouses, there was no touch of religion, except as the motive of every good deed may be said to spring from that source. But when in law we speak of religious and charitable uses, we mean something more specific and technical than the pervading spirit of Christianity. We mean legal acts done for the promotion of piety among men, or for the purpose of relieving their sufferings, enlightening their ignorance, and bettering their condition. And such acts, however informal at law, courts of equity uphold and effectuate, according to the intentions of the donors, *pro salute populi.*

Now, in view of this current of our own authorities, it seems to me unnecessary to discuss the adjudications upon this prolific subject in England or our sister states, and this may be safely concluded: that the religious element which was found in the

[Miller *v*. Porter.]

bequest in Price *v*. Maxwell was wanting in all of the above-named cases from Martin *v*. McCord down to Cresson's Appeal. Yet they were held to be charities, no less than the bequest to the West Town School. Then they would each of them have fallen under the provisions of the 11th section of the statute, if, after the date of the statute, they had been made within a month before the death of the donors. This conclusion is inevitable, unless we upset the reasonings and authorities contained in Price *v*. Maxwell, which it would be neither desirable nor easy to do. But if all these cases, in which the gifts were not made to religious bodies or for their benefit, but to neighborhoods for educational purposes in mere secular learning, were no less charities than that to the West Town School, how is the Porter University to be distinguished and taken out of the line of our decisions? You say it was not founded to promote religion or religious education, but to immortalize the founder, and therefore it was not a charity. If the premises be granted, the conclusion does not follow, because, though it has no stamp of religion, and the selfishness of motive may take away from it the high and abstract quality of a Christian charity, yet it was to be a seat of learning—a university—a centre from which the rays of educated intelligence were to radiate in all directions, and if to found a schoolhouse at the cross-roads of a township be a legal charity, though the selfish motive be apparent, much more to found such a university is a legal charity. And if a charity within the legal sense of that word, then it is as much within the purview of the statute as the bequest to the West Town School, and Price *v*. Maxwell rules the case.

No matter that it was not to be a free school; it was to bring the opportunities of education nearer home to the people; and he who cheapens popular education, or tempts a larger number into "wisdom's ways," is a public benefactor, and what he does is, in the sense of the statute, a charity.

The only other point that needs to be touched is, that the bequest was not helped by the charter of incorporation. If the devise was void, the estate descended to the heirs directly the testator died, and was a vested estate in them which the legislature could not take away and give to the trustees without compensation. Nor did they mean to do this. They legislated only with reference to that which they supposed had passed to the trustees under the will. The judicial conclusion being that nothing passed to the trustees under the will, the legislation goes for nothing.

The decree is affirmed.