STATE ex rel. J. W. OLSEN and Another v. BOARD OF CONTROL OF STATE INSTITUTIONS and Others.[1]

January 3, 1902.

Nos. 12,885—(208).

### Title of Act—Construction of Const. Art. 4, § 27.

Under claim that a law is in conflict with section 27, article 4, of the state constitution, declaring that "no law shall embrace more than one subject, which shall be expressed in its title," canons of construction have been adopted by this court which may be summarized as follows: That every law is presumed to be valid; that this provision of the constitution is to be liberally construed, and all doubts resolved in favor of the law; that the title should also be liberally construed, giving to its general words paramount weight; that it is not essential that the best or even accurate words in the title be employed, but the remedy to be secured and mischief avoided furnishes the best test of its sufficiency to prevent such title from being made a cloak or artifice to distract attention from the substance of the act, provided the title be fairly suggestive, and not foreign to its purpose.

### Laws 1901, c. 122—Charitable Institutions—Normal Schools.

From a consideration of the title (Laws 1901, c. 122), which reads as follows: "An act to create a state board of control, and to provide for the management and control of the charitable, reformatory and penal institutions of the state, and to make an appropriation therefor, and to abolish the state board of corrections and charities,"—*Held*, that the phrase "charitable institutions," in the title, under the liberal rules of construction applicable to such cases, is within the legal tests above designated and fairly suggestive of the supervision by the state board of control of the finances of the state normal schools, and hence not obnoxious to section 27, article 4, of the state constitution.

Proceedings in the supreme court in the nature of quo warranto to oust and exclude respondents, state board of control and its members, from the management of the financial affairs of the state normal schools, and from interference with the state normal school board in the exercise of its right to manage said affairs. Writ of ouster denied.

[1]Reported in 88 N. W. 533.

*W. B. Douglas,* Attorney General, and *Lafayette French,* for relators.

*Harris Richardson,* for respondents.

LOVELY, J.

Information by the attorney general, upon the relation of J. W. Olsen, a member of the state normal school board, to test the right of the board of control to manage the financial affairs of the normal schools of this state, as provided in Laws 1901, c. 122. The information sets forth that the board of control is usurping the functions of the normal school board, in making contracts and regulating its finances contrary to law, and thereby intruding upon their rights and franchises. On the return of the writ a motion was made to quash. We have reached a conclusion that renders it unnecessary to consider such motion.

The board of control answered, setting forth matters in which appear the grounds relied upon to sustain its authority to supervise the finances of the normal schools. A demurrer was interposed, wherein the facts stated in the information are admitted, but the relators claim they are not a justification of respondents' acts, upon the ground that Laws 1901, c. 122, creating a state board of control, so far as it relates to the normal schools, is in violation of section 27, article 4, of the state constitution, which provides that "no law shall embrace more than one subject, which shall be expressed in its title."

On this review there should be no misunderstanding of the precise question this court is to decide. It must be admitted at the outset that views of the policy of the law are not before us. It is not for us to say whether it is best for the legislature, in the interests of economy, to provide for a control of the finances of the state institutions, and particularly of the normal schools, by a board of supervision, as attempted by this act, nor is it to be questioned that sufficient provisions are in the body of the statute itself to effect that purpose; but it is upon its alleged defective title alone that relator seeks to have it nullified, so far as it relates to the five normal schools of the state.

The title reads as follows:

"An act to create a state board of control, and to provide for the management and control of the charitable, reformatory and penal institutions of the state, and to make an appropriation therefor, and to abolish the state board of corrections and charities."

The gist of relators' contention against the law is that the normal schools are in no sense embraced in or suggested by the words of the title, "charitable institutions"; that the normal schools are distinctively educational in character—hence excluded from the title as plainly as if by a proviso declaring that the law should not apply to them.

It is proper to state here that, in the quotations we make hereafter, the italics are our own.

The duty of a court to set aside a statute because it is invalid is peculiarly an incident of our national and state policy. It was first asserted by the great judges who laid the foundations of our jurisprudence, but with the potential qualification well stated by that eminent jurist, Chief Justice Shaw, as follows:

"When called upon to pronounce the invalidity of an act of legislation passed with all the forms and solemnities requisite to give it the force of law, courts will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light on the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt." In re Wellington, 16 Pick. 87, 95.

Said Chief Justice Marshall in an early case in the United States supreme court:

"The question whether a law be void for its repugnancy to the constitution *is at all times a question of much delicacy,* which *ought seldom, if ever, to be decided in the affirmative in a doubtful case.*" Fletcher v. Peck, 6 Cranch, 87, 128.

Said Justice Washington in the same court:

"If I could rest my opinion in favor of the constitutionality of the law on which the question arises on no other ground than this doubt, * * * that alone would, in my estimation, be a satisfactory vindication of it." Ogden v. Saunders, 12 Wheat. 213, 270.

It may be said to be conclusively settled at this time that the

duty to pass upon the validity of a statute calls for the exercise of the highest authority in the highest court of the land. Of such obligation, when the occasion exists, there can be no question; but the co-ordination of the three divisions of government—executive, judicial, and legislative—must be kept inviolate and independent of each other.

No tribunal has heretofore manifested a more decided purpose to maintain the proper equilibrium between these powers of government than this court. It has many times resolved doubts in favor of statutes, but has guarded with jealous solicitude and earnest fidelity the prerogatives of the lawmaking body. Said Justice CORNELL:

"Plenary legislative power is therefore the rule, while want of it is the exception. As a sequence it logically follows that every statute duly passed by the state legislature is presumably valid, and this presumption *is conclusive* unless it affirmatively appears to be in conflict with some provision. of the federal or state constitution; and, in order to justify a court in pronouncing it invalid because of its violation of some clause of the state constitution, its repugnancy therewith must be so *'clear, plain, and palpable'* as to leave no reasonable doubt or hesitation upon the judicial mind." Curryer v. Merrill, 25 Minn. 1, 4.

This court, speaking through GILFILLAN, C. J., said:

"There is no express provision to that effect. But, rather than hold the law to be void, the court will find such provision by implication, if the act will admit of such construction," to sustain it. Woodruff v. Town of Glendale, 26 Minn. 78, 1 N. W. 581.

See also Ames v. Lake Superior & M. R. Co., 21 Minn. 241, 282; Fletcher v. Peck, supra; People v. Draper, 15 N. Y. 532, 543; Sharpless v. Mayor, 21 Pa. 147.

A consensus of opinion in the legal tribunals of the whole country upon the duty of courts in this regard imposes no passive obligation, but requires of the judiciary an active, earnest effort to save a legislative enactment, if that end can be accomplished upon reasonable grounds or by the solution of doubts in its favor. Through a long course of our own judicial history, continuing from the first session of this court to the present term, the attempt has

been made repeatedly by able and astute lawyers to prevent the enforcement of important laws by aid of the constitutional provision invoked to defeat the act in question, but generally without avail. Upon an unruffled current of opinion in this court there comes down to us such views of the organic law in this respect that peculiar rules have grown into use and have been followed for the purpose of sustaining legislative acts, that would now seem to forbid original consideration of the subject; but different conclusions among members of the court require a somewhat extended review of the question.

To restate the substance of relators' claim, compressed into the briefest formula possible, it is: "Charitable institutions" are not educational institutions. Normal schools are educational, not charitable, institutions. The title is therefore defective, since it omits the word "educational"; hence, so far as it relates to normal schools, the law is void. This appears plausible, and, standing alone, without other considerations, it is of apparent force, and, if this were a case for the strict construction of the constitutional provision referred to, would be entitled to more respect than we are inclined to give it; for it may be conceded that, in a popular sense, the words "charitable" and "educational" are distinguishable. Were it not so, this controversy would doubtless never have arisen. But, upon a clear understanding of the manner in which it has been thought essential to apply this limitation of the organic law, it seems to us that this distinction is not controlling; for, if the words of a statutory title may in any sense be held to embrace or suggest a meaning consistent with the substance of the law, the court should not take such a narrow view of its purpose as to set aside or repeal any of its provisions for a mere fault in the title. To do so would be a usurpation by the court of legislative powers.

Unquestionably, the first consideration in construing a constitutional or legislative enactment is the remedy to be sought and the mischief to be cured. This is elementary.

The opinion of this court taken from the earliest adjudication on this subject gives the best historical statement we have seen of the origin of section 27, article 4, of our constitution. Said Justice FLANDRAU:

"A knowledge of the character of the legislation which preceded the forming of a state constitution will show that a very vicious system prevailed, of inserting matter in acts which was entirely foreign to that expressed in the title, and by this means securing the passage of laws which would never have received the sanction of the legislature, had the members known the contents of the act. It was to prevent frauds of this nature that section 27 of article 4, was passed, and it has, and was intended to have, the effect of defeating the action of the legislature, even if the members are so inattentive as to overlook such extraneous matter after the bill has been read twice at length. * * * The system is thorough, and means to secure to the people fair and intelligible legislation, free from all the tricks and finesse which have heretofore disgraced it." Board of Supervisors of Ramsey Co. v. Heenan, 2 Minn. 281, 287 (330, 336).

In that case it was held that the title of the act, "To provide for township organizations," was sufficient to embrace provisions relating to county government. The court said further:

"Although the technical sense may bring it within the letter of the constitution, it leaves it entirely without the spirit. There is no attempt at fraud, or the interpolation of matter foreign to the subject expressed in the title." 2 Minn. 281, 291 (330, 339).

The title of "An act for homestead exemption" has been held to sustain provisions in the body of the statute exempting personal property (seemingly quite foreign to homesteads). It was said in that case, through EMMETT, C. J.:

"There was no evidence of an attempt fraudulently to insert matter foreign to the subject expressed in the title; there was no violation of the spirit of the constitutional provision, though it may not have been followed to the letter in adopting the title." Tuttle v. Strout, 7 Minn. 374, 376 (465, 468).

Again, this court, through GILFILLAN, C. J., said:

"Courts therefore give it [section 27, art. 4] a liberal construction. The insertion in a law of matters which may not be verbally indicated by the title, *suggested by it, or connected with, or proper to the more full accomplishment of, the object so indicated,* is held to be in accordance with its spirit." State v. Kinsella, 14 Minn. 395, 397 (524, 525).

In a later case this court, speaking through Justice CORNELL,

in a very thorough review of the purpose of section 27, article 4, said:

"Neither is it important that all the various objects of an act be expressly stated in its title, nor that the act itself indicate objects other than that so mentioned, provided they are not at variance with the one so expressed, but are consonant therewith."

This court in that case upheld a title of an act regulating the traffic in intoxicating drinks, as embracive of the legislative purpose to found and maintain an asylum for inebriates. State v. Cassidy, 22 Minn. 312.

In an act entitled "An act to regulate the foreclosure of real estate," this court upheld a statute providing for redemption from execution sales. Said GILFILLAN, C. J., in that case:

"The subject is, perhaps, not very accurately expressed in the title, and *we may have to look into the body of the act to ascertain the precise sense in which the terms are used.* 'Foreclosure of real estate' is somewhat indefinite, but it suggests, if it does not clearly express, the general subject of the act, and it is suggestive of sales by execution, as well as of sales under mortgages." Gillitt v. McCarthy, 34 Minn. 318, 319, 25 N. W. 637.

Again, under a title to amend "An act to incorporate the city of East Grand Forks," the amendment required that nine-tenths of the municipal receipts from liquor licenses should be turned into the treasury of one of the school districts already established in Polk county. While no provision of the act amended had reference to this school, it was held, in the language of Justice COLLINS, in the syllabus, that:

"It is not important that all of the various objects of an act be expressly stated in its title, or that the act itself indicates objects other than that so mentioned, provided they are not at variance with the one so expressed, but in consonance therewith." State v. Madson, 43 Minn. 438, 45 N. W. 856.

The principle has also been laid down by this court, where a construction of the words of a previous statute, if adopted in testing the sufficiency of the title of a subsequent act, would defeat the law, that such test was not appropriate or proper, as stated by Justice VANDERBURGH:

"The only question of importance is whether the words 'wages of laborers,' embraced in the title, may fairly be given so broad an interpretation [as to apply to telegraph operators] and thus be consistent with the language and purpose of the legislature as expressed in the body of the act. The constitutional provision which requires the subject to be expressed in the title of a law passed by the legislature is to have a practical and liberal construction, and it is sufficient if the title fairly and reasonably expresses the subject and purposes of the act.  *  *  *  The act is intended to exempt, in general, wages earned by persons standing in the relation of servants or employees, and it is not limited to toilsome and unskilled labor merely, to which the term *'laborer' is more strictly and accurately applicable* [as previously held in construing the terms of the law in Wildner v. Ferguson, 42 Minn. 112, 43 N. W. 794]. The title is not carefully worded, but we think the word 'laborer,' as used in connection with 'wages,' may, in a general sense, be applied to employees other than workingmen engaged in manual labor, consistently with the provisions of the act. And, that being so, the court will so construe it in connection with the language used in the body of the act, and will, if necessary, give it the broader signification, in order to uphold the constitutionality of the law." Boyle v. Vanderhoof, 45 Minn. 31, 32, 47 N. W. 396.

The significance of this case is the distinction it makes in the liberal rule applied in upholding the constitutionality of an act upon the consideration of its title, and the more strict rule applicable in construing the act itself. For instance, in a controversy between the normal school board and the board of control as to their respective powers under the act before us a more strict rule of interpretation would be applied than when considering the constitutionality of the act, by its title. In a still later case, passing upon the probate code then recently adopted, this court said through Justice MITCHELL:

"The intention of the legislature obviously was to enact, in the form of one act, a complete system of statutory law relating to or connected with those matters of which, under the constitution, probate courts have jurisdiction." In holding that act valid, the court further says that this constitutional limitation (section 27, article 4), was passed: "First, to *prevent what is called 'log-rolling legislation' or 'omnibus bills'*;  *  *  *  second, *to prevent surprise and fraud upon the people*;  *  *  *  and, in deciding whether an act is obnoxious to this provision of the constitution, *a very good*

*test to apply is whether it is within the mischiefs intended to be remedied."* Johnson v. Harrison, 47 Minn. 575, 50 N. W. 923.

For want of space, many other appropriate quotations from cases in this court (cited hereafter) must be omitted, to call attention to views which the bench, as now constituted, have been required more recently to express. Justice BROWN, in a recent decision, used the following language:

"*In determining the purpose of a statute, we must look to all its parts, not merely the title.* * * * The object of requiring the title to express the subject of the act is to furnish the legislature . with short and concise information concerning the proposed enactment. * * * 'The provision does not require that the subject of the bill *shall be specifically and exactly expressed in the title*; hence we conclude that any expression in the title which calls attention to the subject of the bill, although in general terms, is all that is required.'" Lien v. Board of Co. Commrs. of Norman Co., 80 Minn. 58, 64, 82 N. W. 1094.

In a more recent case, in the words of the present CHIEF JUSTICE, it was held that the object of this provision was

"To secure to every distinct measure of legislation consideration solely upon *its individual merits,* by preventing *the combination of different measures,* dissimilar in purpose and character, for the purpose of securing the necessary support for their passage, *and to prevent fraud upon the people and the legislature by including in an act provisions of which its title gives no intimation.* It was not intended to embarrass legislation by making laws more restrictive in their scope and operation than is reasonably necessary in order to conserve the purpose for which the constitutional limitation was adopted; hence it must be liberally construed."

Again: "It would be absurd, *as well as discourteous, to impute to the legislature an intention to limit the meaning of general words used in the title of the act so as to defeat the expressed purpose of its enactment.* It is true that material omissions in the title to an act cannot be supplied by a reference to the enacting clause, but, when the question is whether general words appearing in the title of an act were intended to be read according to their natural and usual meaning or in a restricted sense, *the title and the enacting clause should be read and construed together.*" Winters v. City of Duluth, 82 Minn. 127, 84 N. W. 788.

In the latest decision on this question it was held, in the words of the writer, that:

"We must adopt the view that the constitutional restriction relied upon by plaintiff [section 27, article 4] should be liberally construed, and, if it appears from such a construction that its title reasonably directs attention to the subject of the act or its provisions, *and is not a 'cloak' or artifice* for legislation upon dissimilar matters, but refers to matters intelligently, *reasonably, and naturally connected therewith, or suggested thereby,* the subject as expressed in such title is sufficient." Ek v. St. Paul P. Loan Co., 84 Minn. 245, 87 N. W. 844.

This was in an action where the title of the act referred to "the duties of the board of public works" of St. Paul, which was held to be reasonably suggestive of the duty of the city treasurer to execute certificates of sale in a certain way.

The conclusions above quoted have been amplified and illustrated in support of the views of the majority of the court in many other decisions, to which attention is now called: Atkinson v. Duffy, 16 Minn. 30 (45); Hoffman v. Parsons, 27 Minn. 236, 6 N. W. 797; Minnesota Loan & T. Co. v. Beebe, 40 Minn. 7, 41 N. W. 232; City of Winona v. School Dist. No. 82, 40 Minn. 13, 41 N. W. 539; Allen v. Pioneer-Press Co., 40 Minn. 117, 41 N. W. 936; State v. Bigelow, 52 Minn. 307, 54 N. W. 95; State v. Chapel, 63 Minn. 535, 65 N. W. 940; First Nat. Bank of Shakopee v. How, 65 Minn. 187, 67 N. W. 994; State v. Board of Commrs. of Red Lake Co., 67 Minn. 352, 69 N. W. 1083; State v. Phillips, 73 Minn. 77, 75 N. W. 1029.

While no tribunal has furnished more numerous or effective evidences of the liberal purpose of this limitation in the fundamental law, it is not inappropriate to call attention to the fact that this court does not enjoy the unsocial distinction of standing alone in this respect. We find in a reliable text writer on Statutory Construction, the following:

"The courts with great unanimity enforce this constitutional restriction [section 27, art. 4] in all cases *falling within the mischiefs intended thereby to be remedied.* And, in cases not within those mischiefs, *they construe it liberally to give convenient and necessary freedom,* so far as is compatible with the remedial measure, to the lawmaking power. They agree that whilst it is necessary to so expound this provision as to prevent the evils it was designed to remove, *it is no less desirable to* avoid the opposite extreme, the necessary effect of which would be to embarrass the legislature in

the legitimate exercise of its powers, by compelling a needless multiplication of separate acts, as well as to introduce a perplexing uncertainty as to the validity of many important laws which must be daily acted upon. To facilitate proper legislation, it will not be interpreted in a strict, narrow, or technical sense, but reasonably." Sutherland, St. Const. §§ 82–93.

See also Bowman v. Cockrill, 6 Kan. 311; O'Leary v. County, 28 Ill. 534; Wishmier v. State, 97 Ind. 160.

We have, therefore, been compelled to conclude that the conditions controlling the interpretation of section 27, article 4, are not now open to doubt or discussion, but that we should adopt rules established by our own previous decisions, the result of which may be fairly summarized as follows: Every reasonable presumption should be in favor of the title, which should be more liberally construed than the body of the law giving to the general words in such title paramount weight. It is not essential that the best or even an accurate title be employed, if it be suggestive in any sense of the legislative purpose. The remedy to be secured and mischief avoided is the best test of a sufficient title which is to prevent it from being made a cloak or artifice to distract attention from the substance of the act itself. The title, if objected to, should be aided if possible by resort to the body of the act, to show that it was not intended by such title to mislead the legislature or the people, nor distract their attention from its distinctive measures.

Throughout all the decisions it will be found that it is a regard for the law itself, rather than any puerile consideration for the title, which is made the essential object of judicial anxiety. A review of the cases where this court has set aside statutes because in violation of section 27, article 4, will show that the act was in every respect (to adopt the language of Justice FLANDRAU in Board of Supervisors of Ramsey County v. Heenan, supra) entirely foreign to the object "expressed in the title," thus furnishing the evidence of such a fraud in securing its enactment that the law "would never have received the sanction of the legislature, had the members known the contents of the act."

No better test, consistent with every subsequent decision on this subject, can be made than by a correct answer to the question: Is

this title in every respect *"so foreign to the purpose of the act, or some integral part of it,* that it gives no intimation thereof"? It may seem from a cursory glance at these liberal views which have been adopted to save statutes when attacked upon the ground of defective titles that little is left of inherent vitality in the constitutional limitation involved, but that this is only a cursory view must be apparent upon the reflection that the constitutional limitation was solely to prevent fraud and deception when determinable from the evidence found in the act and its title read together, for obviously no other evidence is open to the courts.

The constitutional provision sounded a note of warning that has generally protected the people from legislative juggles, while the liberal interpretation since given by this court has saved many wholesome laws that otherwise would have been defeated by a narrow view of its purpose. Legislators may not have become absolutely perfect, and it may be that fraud will hereafter finesse into an act a "woodchuck" which will be so apparent on judicial review as to require the court to nullify a result which never expressed the real legislative purpose. When such occasion does arise this provision of our constitution will, we believe, be found to retain its pristine vigor, with plenary power to prevent the consummation of the infamy. In the meantime it stands forth in the organic law a danger signal to protect the people from the mischief that called it into being.

Recurring to the rule stated in State v. Kinsella, supra, viz: "The insertion in a law of matters which may not be verbally indicated by the title, if suggested by it, or connected with, or proper to the more full accomplishment of, the object so indicated, is held to be in accordance with its spirit"; hence we naturally turn to the authoritative definitions of the derivative word "charitable" in this title, as well as the substantive noun, "charity," from which it is derived, to see if they are at all suggestive of characteristics of the normal schools. These words have been defined in the Century Dictionary as follows: "In a general sense, the good affections men ought to feel toward one another. Good will; specifically, alms." Again: "A charitable institution; a foundation for the relief of a certain class of persons by alms, *education,* or care."

Again: "A gift in trust for *promoting the welfare of the community or of mankind at large,* or some indefinite part of it, as an endowment for a public hospital, *school,* church or library." Thus in the general sense which may very reasonably have had force with the legislature, the words defined are among the most comprehensive in our language, and embracive of educational institutions, among them those for the culture of teachers, where the element of good will, donation, and gifts have effected their endowment, and secured benefits not otherwise obtainable to their patrons. In the standard legal authority upon definitions, "charity" is designated as "a gift to general public uses, *which may extend to the rich as well as the poor.*"

"Charity, in its legal sense, comprises four principal divisions,—trusts for the relief of poverty, *trusts for the advancement of education,* trusts for the advancement of religion, and trusts for other purposes beneficial to the community not falling under any of the preceding heads." Bouvier, Dict. tit. "Charitable Uses, Charities."

We ought not to be "so discourteous to the legislature" as to assume that it ignored such definitions; nor ought we to destroy the effect of its work, approved by the executive of the state, if it reasonably appears that it intended to do so. It must, on elementary grounds, be presumed that the legislature did not intend to violate the organic law, neither, in drafting and enacting laws, to disregard the standards of definition, nor to ignore the use which the courts have made of words and phrases. The words "charity" and "charitable" have received an interpretation in many cases in England and America, at least since the adoption of the statute 43 Eliz. c. 4, "regulating charitable uses," wherein it has been found necessary to interpret these words liberally (to what were unquestionably educational institutions) as reasonably suggestive that establishments of learning furnishing tuition free of charge, or for a smaller sum than otherwise obtainable, were, in a certain sense, "charitable institutions."

This has nowhere been better expressed than by Chief Justice Shaw, who said:

"That a gift designed to promote the public good, by the encour-

85 M.—12

agement of *learning, science, and the useful arts, without any particular reference to the poor*, is regarded as a charity, is settled by a series of judicial decisions, and regarded as the settled practice of a court of equity." American v. Harvard, 12 Gray, 582.

Again:

"Nor has it ever been supposed in this country, that an institution established for the purposes of education is not a charity within the meaning of the law, because it sheds its blessings, like the dews of heaven, upon the rich as well as the poor." Price v. Maxwell, 28 Pa. 23.

Again, later in the same case (page 36), it was held:

"It is true there is a narrower sense in which the word charity may be understood. The benevolence which limits itself to giving alms to the poor comes within this restricted definition; but it falls far short of that true charity which has its origin in the two great sources of all good deeds,—the love of God and the love of man. Instruction in useful knowledge is essential to the permanent comfort and happiness of mankind."

Again, in the same opinion, it was held:

"In the section of the act of 1855, in question here, there is nothing to show that the terms 'charitable uses' were used in a restricted or popular sense. Nor can we fairly infer from any other part of the act that they were so used. We are, therefore, bound to understand them in their legal and technical signification. We have no doubt that they were so understood by the legislature, and that they were intended to embrace objects of a religious, literary, and scientific character, as well as those which related to the poor and the afflicted."

We might continue quotations from analogous cases to sustain the views above expressed, sufficient to fill a volume. We must be content in citing some of the leading and more important decisions which sustain the views above stated: Morice v. Bishop, 9 Ves. 399; Id. 10 Ves. 521; Attorney General v. Earl, 1 Sim. 105; Franklin v. Armfield, 34 Tenn. 304; Wright v. Linn, 9 Pa. 433; Drury v. Inhabitants, 10 Allen, 169; Jackson v. Phillips, 14 Allen, 539; Miller v. Porter, 53 Pa. 292.

In many cases in this country where *"charitable institutions,"* so named in legislative acts, are exempted from taxation, it has been

held by courts of the highest respectability that distinctively educational institutions fall within the privileges of such exemptions. In a leading case from Missouri it was held:

"A gift designed to promote the public good by the encouragement of learning, science, and the useful arts, without any particular reference to the poor, and any gift for a beneficial public purpose not contrary to the declared policy of the law, is a charity. And, if such a gift is administered according to the intention of the donor, the property is used for charitable purposes." State v. Academy, 13 Mo. App. 213.

Again in County v. Lafayette, 128 Pa. 132. 147, 18 Atl. 516, the court said:

"Upon these facts we hold that Lafayette College is a secular not an ecclesiastical institution; that it is subject to the control of the state; that it is open to all shades of religious opinion, so that neither as trustee, teacher, or scholar does eligibility depend on church membership or religious opinion. It is public in its character, in its objects, in its control, and, if a charity, is a purely public one. As to its charitable character, it is clear that it was founded and endowed by charity. This is not questioned, and upon the exhibit made in the case stated it is equally clear that it is substantially maintained by charity. That a small fraction of its annual cost may be paid by tuition fees is not enough to deprive an institution substantially maintained by charity of the protection of the act of 1874."

The true question is, on what does this public institution depend for its maintenance? The answer in this case is, almost wholly on the income from its endowments, which were a charity, and on the free gifts of its friends. Again, in Episcopal v. Philadelphia, 150 Pa. 565, 573, 25 Atl. 55, the court held:

"The education of youth and the support of schools are for the advancement of public good, and money given for such purposes was recognized in England as given for a charitable use before the statute of 43 Elizabeth. Our own courts have uniformly held the same doctrine. The school may therefore be regarded as a 'purely public charity' if it can meet the requirements of the law as to the manner of its founding, endowment, and support."

This view is also sustained by Trustees v. City, 100 Ky. 470, 36 S. W. 921; City v. Board, 100 Ky. 518, 36 S. W. 994; Episcopal v. Philadelphia, 150 Pa 565, 25 Atl. 55; Gerke v. Purcell, 25 Oh. St. 229.

The value of these decisions lies in the fact that courts have adopted the criticised words in this title in a liberal way, and given them a meaning perfectly consonant with their legal sense, but broad enough to be of utility in its construction and as inclusive of the normal schools, and presumably acted upon by the legislature.   Thus we find that lawyer and layman alike have defined the words "charity and charitable" in different senses.   One definition always has had, and probably always will have, reference to "educational institutions"; and, if we nullify a law because a definition used in its title is possibly faulty, though not wholly inappropriate or foreign to the subject of the statute, we would but quibble upon a point of mere phraseology to defeat the legislative will because, in the variance of opinion, the best words were not adopted to indicate and point attention to its purpose.   To do so on such grounds would deny to the lawmakers the right of choice in the use of language, and justly impress upon the minds of all who respect legal authority a substantial doubt of judicial consistency.

In the cases cited we find rules adopted to save statutes from being lost upon the rocks of verbal construction.   Such rules must not be disregarded, for they are plain admonitions of duty erected by the oracles of the law as beacon lights of our jurisprudence, to prevent the wreckage of important legislation, through which necessarily all efforts to advance the welfare of the state must be accomplished.   Hence it follows that in the construction of a title to an act the words used should be sufficiently appropriate to acquit the legislature of an intentional fraud to deceive the people, but more than this is not required.   Any other test would unnecessarily add to legislative labor, and surcharge it with an element of doubt and uncertainty, not essential to the discharge of onerous duties, and entirely foreign to the mischiefs to be cured by the constitutional amendment invoked by relator.

The answer of the state board of control alleges facts which show that from the very beginning bequests and donations of considerable value from private parties have been accepted by the state for the benefit of the normal schools on condition of free tuition in some cases and small or merely nominal charges to

patrons in others. The state has also, in its treatment of these institutions, recognized such conditions, based its policy largely thereon, and repeatedly made appropriations for their support, as well as to cover deficiencies in appropriations already made, whose accumulating burdens upon the state treasury may have required the supervision by respondent of their finances. These facts are admitted by the demurrer, and it is not easy to distinguish, under the authorities referred to, in what way the element of charity can be altogether excluded as an attribute to their foundation, either in respect to the generosity of the private donors, or the beneficence of the people speaking through their representatives in the legislature.

It is urged for the relator that the words "charity" and "charitable," however, apply distinctively to alms and relief given to the poor and indigent. This, within the definitions quoted, presents only a narrow aspect of words of the most latitudinarian character, indicative of every blessing bestowed by the bounty of heaven, the benignity of the state, and the good will of man. The normal schools are not institutions, in any sense, for the relief of poverty and indigence; and, if the designation charitable did not go beyond the narrow definition applied by counsel, those who receive instruction at such institutions might well be offended by the use of what appears to be an obnoxious word in the title.

In the argument for relator, it was insisted that "our public schools are open to all, but they are claimed as a right, not accepted as a bounty. In these schools the rich and poor meet on a common equality." In passing, we recall the definitions in the lexicons of the words "charity" and "charitable," where it is expressly indicated that the rich are not legally excluded from benefits of institutions founded under charitable uses, or forbidden to accept the benefit of exemptions. While the above statement of counsel may be accurate, it is outside the real question involved in this review, and we trust it was not intended as an appeal to prejudice. It is a good sentiment where it is applicable, but not effective in an analysis of a statutory title, where a reasonable doubt of its application should sustain it. All persons interested in institutions which do not exclude rich or poor from their

benefits ought not, on charitable grounds, to require exclusion by us of a due appreciation of the legal rules of construction adopted to prevent usurpation of legislative functions by courts, where doubts of the validity of the statute must be resolved in its favor. It is probable, however, that this false sentiment has had more to do in prejudicing this question in the public view than all legal arguments submitted on the hearing of this cause.

The poor and indigent are necessarily objects of charity. Institutions for their relief are charitable, but institutions of learning of the highest character, from the pretentious seats of education in the East to the struggling seminaries of the new states in the West, have received with gratitude gifts, endowments, and donations to aid in the dispensation of knowledge, whose acceptance and use have been creditable alike to those who bestow the benisons as to the aspirants for wisdom, who have received their benefits without a murmur of dissent. We could not excuse ourselves if we accepted this sophistical treatment of the subject to strangle a statute enacted by the legislature and approved by the governor with all the formalities required, upon a technicality that neither aids the indigent, nor adds dignity to the respected teachers of the state, who are giving the most substantial assistance to the educational development of our splendid commonwealth. If a cup of cold water given in the name of the Master shall not lose its reward, the gift of knowledge is not obnoxious to the spirit of that divinest quality, charity, for of the three Christian graces, "Faith, Hope, and Charity," the greatest of these is "Charity"; and no one should deny that in the execution of the sacred trust by the teacher he not only receives, but transmits, the blessings founded upon and extended by charity through means to which the definition "charitable institutions," is applicable and appropriate.

Again, it seems to us that there are· other very substantial reasons why this title must be upheld, derived from the consideration of such title read in connection with the terms of the act itself. The object of the statute, as generally stated in its title, is to create a state board of control. If the words of the title had stopped there, concededly, no fault could be found with its sufficiency to include the normal schools, or put their finances under

the supervision of the board of control. Relator's contention, however, rests upon the claim that the phrase "charitable institutions" are words of limitation. If this be so, under the canon of construction that the expression of one thing is the exclusion of every other, we might be required to go still further, and inquire how the words "charitable institutions" were actually used by the legislature, if able to do so from the body of the act itself, and then to inquire whether the general words, when read in connection with the statute, had not been given a sense that controlled other limiting words in the title.

As stated in the case of Winters v. City of Duluth, supra, "Canons of construction are not the masters of the courts, but merely their servants." It is fundamental that in applying the maxim, "Expressio unius est exclusio alterius," the statute itself should be construed to give effect to the intention of the legislature. Broom, Leg. Max. (7th Ed.) 663. In other words, this canon of interpretation, which is one of strict, rather than liberal, construction, should be of little avail where the title of a statute is to be construed liberally to save the law against a strict construction to defeat it. It logically follows that "whether general words appearing in the title of an act were intended to be read according to their natural and usual meaning, or in a restricted sense, the title and the enacting clause should be read and construed together." Winters v. City of Duluth, supra. Hence, if the general words of this title, "An act to create a state board of control" (excluding limiting words that follow), when read with the substance of the statute, are ample to indicate an intention by the legislature to include normal schools, the title must be held sufficient.

But, if we may not turn from the general words of the title to the body of the act to ascertain the sense in which the title was used, and there appears to be any ambiguity in the view in which the whole title, general and limiting terms included, might have been regarded, we should surely appeal from such title to the language of the statute to find the signification given it by the lawmakers themselves. This conclusion is supported by many authorities in this court already referred to. For an application of

this rule, we recur again to the language of Justice VANDER-
BURGH:

"The court will so construe it [the title] in connection with the
language used *in the body of the act* and will, if necessary, give it
the broader signification in order to uphold the constitutionality
of the law."   Boyle v. Vanderhoof, 45 Minn. 31, 32, 47 N. W. 396.

In other words, we should seek to find whether the provision of
the act itself indicates that the whole title was regarded by the
legislature as sufficient; for, if it appears that it may have been so
regarded by that body, it cannot be held that it was "a cloak or
artifice to perpetrate a fraud," and thus forbids any such claim
for the relator.

In Laws 1901, c. 122, § 18,—the act in question,—we find the
following language:

"Such board of control, however, shall not have control over, or
authority to disburse, any private donations   *   *   *   to any
educational institution of this state, but said private gifts   *   *   *
shall   *   *   *   be applied by such various boards of the said
educational institutions."   Again: "But the various boards now in
charge of the several educational institutions, shall have and·
retain the exclusive control of the general educational policy of
said institution.   *   *   *   All contracts with employees of said
educational institutions shall be reported by the board in charge
of said several institutions."

The educational institutions referred to are expressly named in
this section.   They are the state university, the state normal
schools, the state public school, the school for the deaf and blind.
Each of these is, to a certain extent, educational in character, but
it must be conceded that the school for the deaf and blind and the
state public school are charitable institutions for waifs also.   We
cannot but draw the necessary inference from this use and refer-
ence to these institutions that the legislature intended to apply the
word "charitable" to all; i. e., not to discriminate on the line be-
tween charity and education, nor to distinguish either the state
university or the normal schools from the other institutions which
are both educational and charitable.

Particular stress on the argument was laid upon the use in the

constitution and statutes of the words "charitable and educational," and an attempt has been made in citing provisions of the organic law and statutes, to show that a distinction had been drawn between each that amounted to controlling weight, excluding the normal schools from the class designated as "charitable institutions." We are unable to find any controlling definitions in the statute of these words. While many words and phrases have been given a statutory definition in G. S. 1894, c. 4, none is attempted of the words or phrases in question. If anywhere in the state constitution there had been such a definite classification, clear and well expressed, it would be of considerable force, but there is none. The most that can be said in favor of this claim is that both terms are used connectively as well as distinctively, without any attempt to define accurately what is a charitable, as distinguished from what is an educational, institution. In the last authoritative revision of 1866 the agricultural college was included under the title of "Charitable Institutions." In subsequent compilations by private parties there have been other and different divisions made, but of no particular weight, expressive of legislative meaning, and are only evidences of the opinion of the compiler. Even if there were well-defined distinctions in this respect in the previous statutes, it would still be competent for the legislature to depart therefrom; and if the last statute has adopted a classification of its own, as we think it has, it would be the final decisive expression of legislative will in that respect, and conclusive upon us, so far as its own division of subjects.

In section 18 of the act under consideration, there is an attempt at classification by division of authority possessed by the board of control between the different state institutions. Such board has full control over the prisons, reformatories, hospitals, asylums for the insane, etc. Such board has likewise a limited control over the state university and the state normal schools, the state public school, and the school for the deaf and blind. The public school and the school for the deaf and blind are popularly understood and classified in the compilation of 1894 as charitable institutions. They are treated and classified in section 18 of the law under consideration, in connection with the state university and the state

normal schools, as educational institutions; and it follows that, if the legislature had previously made a classification which distinguished these two from educational institutions, such distinction has been abandoned in this act, and another classification adopted.

To repeat, the question before us is not whether this statute has the best title and is wisely labeled, but whether its title is so foreign to and unsuggestive of the provisions relating to the normal schools that we must hold that the body enacting the law has been deceived by log-rolling provisions into it, contrary to the real purpose of the legislature. We are not required to hold, and we do not hold, that normal schools are, in fact, as the term is generally understood, "charitable institutions." The real question is whether, in applying the reasons repeatedly announced by this court to save the work of the lawmakers from being defeated by the limitation in the organic law, we should adopt or avoid a reasonably fair construction that should be accorded it, to give vital force and efficiency to legislative will.

In conclusion, we may add that we have given the subject involved the consideration which its importance has seemed to demand, but the real issue legally considered seems to us quite simple. The result appears so unavoidable, whether based upon principle or authority, that we might apologize for the length of this opinion, were it not for differences of views which have arisen between the members of this court as to the right to set aside an act of legislation against previous rules so clear that they lead to but one result. This is no question of nice construction in interpreting what a law is, but a judicial effort to reach a conclusion in harmony with the constitution and the statute under review, to save the law, which is complete in its body, from rules which should not prevail when comparing the title with the act. We have not felt at liberty to disregard the doctrine of stare decisis, that must abide where there is a settled system of jurisprudence upon which reliance may be placed to ascertain what the law is, in an effort to preserve stability and respectable consistency. Had we done otherwise, we would have justly subjected ourselves to the criticism of Chancellor Brougham in the celebrated case of O'Con-

nell v. Reg., 11 Clark & F. 155, by placing upon the records of this court a decision that would "go out without authority, and return without respect."

The writ of ouster denied.

START, C. J. (dissenting).

I dissent. The precise question is whether that part of the board of control act which relates to our state normal schools is unconstitutional, because the subject of the control of such schools is not expressed in the title of the act, within the meaning of the mandate of the state constitution that "no law shall embrace more than one subject, which shall be expressed in its title." I am of the opinion that the question must be answered in the affirmative.

The rules of construction applicable to this constitutional provision, stated in the majority opinion, are undoubtedly correct, for they have been definitely settled by the repeated decision of this court. But another rule is equally well settled. It is this: The title to an act may be as broad and comprehensive, or as narrow and restricted, as the legislature may choose; but if the title adopted be a restricted one, carving out for treatment only a part of a general subject, the legislation under such title must be confined within the same limits. Cooley, Const. Lim. 178. Therefore, if the legislature selects a restricted title, the courts can neither enlarge nor amend it by construction, but must hold provisions in the body of a statute, as to a subject which is excluded from its title by restrictive words, unconstitutional.

Is the title of the act in question restrictive, within the meaning of this rule? The question is answered by a mere reading of the title, which is this:

"An act to create a state board of control, and to provide for the management and control of the charitable, reformatory, and penal institutions of the state, and to make an appropriation therefor, and to abolish the state board of corrections and charities."

If the title had read, "An act to create a board of control and to provide for the management and control of the public institutions of the state," the title would have been general, and would have embraced the subject of the management of normal schools. But

the legislature, by carving out for treatment a part only of the general subject of the management of our state institutions, by specifically naming the state institutions, the management of which was to be provided for by the act, made the title a restrictive one, and, by necessary implication, excluded from the purview of the act all state institutions not therein specially enumerated. It logically follows that, if the subject of the management of the state normal schools is expressed in this title, it is because, and only because, they are charitable or reformatory or penal institutions of the state.

The majority opinion, as I understand it, holds that the phrase "charitable institutions," as used in the title of this act, is fairly suggestive of the supervision by the board of control of the finances of the state normal schools. This conclusion is reached by invoking the definition of the word "charity" adopted by courts of equity in applying the rule or doctrine of charitable uses. A brief reference to the origin and growth of the rule will indicate that such equity definition of "charity" does not afford the slightest support for the conclusion or suggestion that our normal schools are charitable institutions.

The doctrine of charitable uses was established by the courts of chancery of England early in its history. It was, in effect, that gifts and devises given in trust for charitable purposes or uses should not be defeated by the law prohibiting perpetuities, or by any informality or illegality which would by the common law invalidate private trusts. The statute of 43 Eliz. c. 4, did not, according to the trend of modern authority, originate the law of charitable uses; but it systematized the then existing law, and pointed out those trusts which were to be regarded as charitable uses, and exempt from the operation of the statutes against perpetuities.

The rule has been adopted by many of the courts of our country, but not by this court. Little v. Willford, 31 Minn. 173, 17 N. W. 282. It has been the subject of much abstruse legal learning and expensive and complicated litigation. Frequently one of the perplexing questions to be determined in such litigation was whether the purpose of the devise was a charity, and the courts gave such a definition to that word as accorded with their views as to whether

the trust created by the devise in each particular case was for a useful public purpose. If it was, the purpose was held to be a charity, and the trust upheld; otherwise not, and the heirs of the testator took the subject-matter of the gift. This practice sometimes led to curious and interesting results. Thus, in one case a gift for the advancement of the science of phrenology was held to be a valid trust because it was for a charitable purpose, while in another case a legacy for the best essay upon "Natural Theology" was held not to be for a charitable use, because it was inconsistent with Christianity.

It is, however, now the settled law in all jurisdictions in which the statute of Elizabeth is in force that a gift or devise for the advancement of education, even if it be made without reference to the poor, is a charity, within the law of charitable uses. It was necessary for courts of equity to so define "charity" in order to sustain such gifts or devises, and not permit them to lapse. The cause justified the definition. But the broad, common-sense, and popular distinction between "education" and "charity" has always been recognized by the courts of this country, except in cases involving the doctrine of charitable uses, or the taxation of property held for such uses. It is true that the statute of Elizabeth expressly declared that the maintenance of schools of learning and free schools was a charity; but the fact is not significant, for at that time there were not, and never had been, any free schools in England, except those maintained by the charity of the church or other organizations. It was not until after the commencement of the reign of Queen Victoria that the government began seriously to recognize that it was any part of the duty of the state to provide for the education of all of her citizens. Prior to that time the cause of education was in fact, as well as in law, a charity.

But such has never been the case in Minnesota,—a state which by her constitution and laws has from the beginning recognized the fact that the greatness and safety of the commonwealth and the success and character of its people rest upon universal education; a state which, in the exercise of a necessary governmental duty, if our free institutions are to survive, has conferred upon all of her children, not as a charity, but as their birthright, the opportunity

to secure an education.   In the discharge of this high duty and to provide a supply at all times of competent teachers, the state established and maintains our normal schools as auxiliaries to our free common schools.   If the former are charitable institutions, the latter are also.   I cannot believe that the legislature, in adopting the title of the statute in question, intended to reject the usual and popular meaning of the word "charitable," and substitute therefor the ancient and moss-covered definition of "charity" which the chancery court invented centuries ago for the purpose of sustaining charitable uses, and thereby classify the state normal schools and the state university as charitable institutions.   On the contrary, it is manifest from a reading of the title that the legislature was not dealing with definitions, but with an admitted prior classification of the state institutions.   Now, as conclusively demonstrated by Justice COLLINS in his opinion in this case, the constitutional, legislative, executive, and popular classification of such institutions is, and always has been, in this state, based upon the popular and common sense distinction between education and charity.   In such classification our institutions of learning are classified by themselves as "educational institutions," and our institutions for defectives are also separately classified as "charitable institutions."

It follows that the state normal schools are not charitable institutions, but are educational institutions, and that therefore they are not included in the phrase "charitable institutions," in the title of this act.   There seems to be no escape from this conclusion; for the claim or suggestion that such schools are charitable institutions because gifts and devises for the promotion of learning have been held to be a charity, within the meaning of the law of charitable uses, is as unreasonable as would be the claim that they are reformatory institutions for the reason that ignorance and crime are often allied.

COLLINS, J. (dissenting).

In dissenting I desire to state my views on certain propositions which I deem of importance.

The constitutional provision now before us is mandatory, and

should be enforced by the courts with strict fidelity. We should not hesitate to declare a law obnoxious thereto if the subject thereof be not expressed in the title, no matter what may have been the legislative intent. It is not material what motives prompted the incorporation of this particular provision into our fundamental law, for it is there, to be observed by the legislature, and unhesitatingly enforced and executed in the legal tribunals. Its purpose is obvious, however. It was designed to afford an index to all measures pending in the legislature, specifically to point out the object and design of every bill introduced, and to advise all citizens of what is transpiring in the lawmaking body. It was intended for the benefit of public officials and private citizens quite as much as, if not more than, for the information of the members of the legislature, who are on the ground, and can easily ascertain the provisions of every act. This fact seems to have been overlooked in the main opinion, for it is there assumed that the legislators, only, are to be assisted and protected by an observance of this provision. It was inserted to secure to every distinct measure of legislation a separate consideration and decision, dependent solely upon its individual merits, by prohibiting the insertion in such measures of matters wholly foreign to, and in no way related or connected with, its subject, as expressed in the titles of the bills, and also to prevent fraud and "logrolling."

The test to be applied in ascertaining whether the constitutional requirement has been complied with (and a liberal rule is proper) is, does the title fairly suggest the subject of the legislation? Would a member of the legislature, or the public, or one interested as an official or as a private citizen, reasonably expect that a given subject might be affected by legislative action under, or by a bill bearing, a certain title? Would any or all of these persons be put upon inquiry by its title? It is not enough to sustain a law that there is some relationship between the title and its various provisions, but that relationship must be a natural one, and such as to be apprehended from a reading of the title. To illustrate: Under an act entitled "An act relating to the Mississippi Boom Corporation," provisions imposing additional duties upon the plaintiff corporation with respect to logs which went below

its boom limits were held not cognate. Mississippi & R. R. Boom Co. v. Prince, 34 Minn. 79, 24 N. W. 361. The following title, "An act for the protection of employees," was not sufficiently broad to cover provisions relating to firemen of a public fire department. Hamilton v. Minneapolis Desk Mnfg. Co., 78 Minn. 3, 80 N. W. 693.

The inquiry here is: Do any of the provisions of the law in question introduce into the body of the act a subject not expressed or suggested by its title? In other words, are the educational institutions of this state charitable institutions, in any sense, or are they suggested by a title which expressly specifies charitable, reformatory, and penal institutions as the subject of the legislation? The bare use of the term "charitable institutions" must suggest to the reader that educational institutions may also be the subject of pending litigation. We need not cite definitions from the lexicographers to show what, in the present age, are generally understood to be "charitable" and what "educational" institutions, but it may be stated that the former are usually defined as founded "for the relief of certain classes of persons by alms, education, or care; especially a hospital"; as "institutions established for the help of the needy"; as "pertaining to charity; springing from or intended for charity"; while the latter are institutions founded for the express purpose of instructing the youth of our land along mental and physical lines, such instruction not being granted as a bounty, but as of right.

If we were compelled solely to rely upon these definitions, they would be quite sufficient to justify the assertion that our educational institutions are not charitable, within any of the definitions, but the paramount question here is an entirely different one. We are called upon to ascertain what should be understood when these words are used in the statutory jurisprudence of this state, and, as a consequence, what would their use by the legislature suggest or convey to the reader of such a title. To what institutions have these terms been applied, and how have they been used? An examination for this purpose should lead to but one conclusion, in my judgment, namely, that the words "charitable institutions" mean institutions, supported in whole or in part at the expense of the state, for the relief of the indigent, the defective, and the unfor-

tunate,—institutions in which the state dispenses and administers charity to those dependent upon it, and the inmates of which (victims of misfortune) are the beneficiaries and recipients of charity. The kinds of institutions declared by the courts as "charitable" will be seen by an examination of the following cases: County of Hennepin v. Brotherhood of the Church of Gethsemane, 27 Minn. 460, 8 N. W. 595; Wolcott v. Holcomb, 97 Mich. 361, 56 N. W. 837; American v. Phœnix, 4 Conn. 172; McDonald v. Massachusetts, 120 Mass. 432; Clement v. Hyde, 50 Vt. 716; Humphries v. Little Sisters, 29 Oh. St. 201.

Educational institutions are of an entirely different character, and have always been so regarded in the United States. That there has always been a clear distinction in this state is conclusively proven by the line of demarkation found in the constitution, in the statutes, in the laws passed at every session of the legislature since we became a state, in every document which has emanated from the various departments of the executive branch of the government, including all gubernatorial messages,—among them, the inaugural address of the present governor, Hon. Samuel R. Van Sant. This distinction and classification has not only been made in every official act for more than forty years, but it has been adhered to and maintained by universal custom and uninterrupted usage and practice among the common people. It is impossible to find in our entire existence as a state but one departure (to be referred to later) from this well-defined distinction universally made in public acts and in private speech between charitable and educational institutions. This is also true of every other state of the Union. Not one will be found in which the distinction has not been steadily maintained,—always recognized in and out of courts, in executive documents, in legislative halls and in ordinary conversation.

That there has been no confounding or misapprehension of terms or institutions, in so far as this assertion pertains to our own state, let us look at the authorities. In the state constitution the word "charitable" is not used in the sense of "educational," nor the phrase "charitable institutions" in the sense of "educational insti-

85 M.—13

tutions." They are brought in sharp contrast in all places. In article 9, section 3, which exempts certain property from taxation, it is provided that

"Public burying grounds, public school houses, public hospitals, academies, colleges, universities, and all seminaries of learning, all churches, church property used for religious purposes, and houses of worship, institutions of purely public charity, public property used exclusively for any public purpose * * * shall * * * be exempt from taxation."

The distinction there maintained between property devoted to education and that used for charitable purposes is evident. In article 8, section 2, subd. 3, providing for the disposition of the proceeds of a sale of swamp lands, we find:

"One-half of the proceeds of said principal shall be appropriated to the common-school fund of the state. The remaining one-half shall be appropriated to the educational and charitable institutions of the state, in the relative ratio of cost to support said institutions."

This entire article 8 is devoted to school funds, education, and science; and, among other things (section 4), it confirms the location of the state university previously established by law. That it was the design of the makers of our constitution to distinguish between educational institutions and those devoted to public charity is manifest from a reading of this section, which provides for the adoption, as a basis for a division of money derived from a sale of swamp lands, the relative cost to the state of maintaining these two separate classes of public institutions. That they are distinct is plain from a reading of section 4, and this distinction should not be ignored by this court.

Let us now turn to the statutes. In G. S. 1894, § 1512, which relates to the exemption of property from taxation, public school houses, academies, colleges, universities, and seminaries of learning, with books and furniture therein, and the grounds attached to such buildings, are placed as one group in the first subdivision; and all buildings belonging to institutions of purely public charity, including public hospitals, are placed as another group in the sixth subdivision. Here we find a legislative distinction made whereby

educational institutions are placed in one subdivision of the law, and charitable institutions in another. There is no room here for suggestion that they are of like nature. Obviously, they are unlike under the statute. At the first revision (G. S. 1866) of the statutes after we became a state chapter 35 was entitled "Charitable Insti- tutions," and strictly devoted to such institutions, with the excep- tion before referred to, namely, the agricultural college. It was then classified with charitable institutions, undoubtedly because its character had not then been definitely settled. The next chap- ter (36) was entitled "Education," and here we find classified and enumerated common schools, county superintendents, and inde- pendent school districts. The next chapter (37) was entitled and wholly devoted to, "State Normal Schools." Two years later (Laws 1868, c. 1) the state agricultural college was removed from its improper classification, made a department of the state university, and placed with other educational institutions.

In the 1878 compilation of the statutes by Judge Young, chapter 35 was designated "Charitable Institutions," and therein we find denominated as such the institute for the deaf, dumb, and blind, hospitals for the insane, and the state reform school. Chapter 36 of the same compilation is headed "Education," and therein we find our educational institutions specified and treated, including the state normal schools. Chapter 37 is entitled, and the chapter is devoted to, the "University of Minnesota." In the next compila- tion, known as G. S. 1894, by Mr. Wenzell, the same designation, classification, and separation are maintained. The compilation in 1878 was semi-official, while that in 1894 was, of course, a private enterprise, but in both we find the distinctive classification which had been inaugurated by the state itself in the General Statutes of 1866. That the able editors of these compilations understood that our educational institutions were entirely distinct and separate from the charitable, conclusively appears.

This distinctive statutory classification has been recognized, ap- proved, and accepted, officially and otherwise, by the people of this state, for more than forty years, without a single objection or protest. Not a person has intimated that it was not accurate, clearly made, and absolutely necessary. In all these years not a

soul within our borders had thought that our educational institutions could, for any purpose, be regarded as charitable, or that legislative mention of one suggested the other.   In every legislative manual prepared in the office of the secretary of state under the direction and for the use of the members of the house and senate, the distinction has been maintained.   Under the head of "Correctional and Charitable" have appeared all references to the institutions conceded by all to be correctional or charitable, namely, hospitals for the insane, schools for the deaf and dumb, for the blind, for the feeble-minded, for dependent children, the state training schools, the soldiers' home, the state reformatory, and the state prison.   Under the title "State School System," our state university, state normal schools, and public schools have been classified, and regarded as wholly educational, not charitable or correctional in any sense.

Referring specially to legislative enactments which maintain and emphasize this distinction, we call attention to Laws 1883, c. 131 (G. S. 1894, § 525), which provides

"That all official bonds of state officers, and of the treasurers of the several public, educational, charitable, penal, and reformatory institutions belonging to the state, shall be approved," etc.

Here we notice that the distinction between educational and charitable institutions was properly observed, and that each class was specifically mentioned.

At the same session the state board of corrections and charities, established by chapter 127, was authorized (G. S. 1894, § 460) to "investigate the whole system of public charities and correctional institutions of the state." In the same section the governor was authorized, in his discretion, to order an investigation by the board, or by a committee of its members, "of the management of any penal, reformatory or charitable institution of the state."

In section 463 it was provided that

"Whenever the governor shall deem it advisable and expedient to obtain information in respect to the condition and practicable workings of charitable, penal, pauper, and reformatory institutions in other states, he may authorize and designate any member or

members of said board, or the secretary thereof, to visit such institutions in operation in other states."

It was this act which was expressly repealed by the one now under consideration, but while it was in force no one claimed that it had the slightest application to, or suggested any authority over, our state university, or normal schools, or our public schools. Had this board attempted to investigate the management of any of these schools, its right so to do would have been publicly ridiculed. It is hardly necessary to say that authority to inquire into the condition and practical workings of charitable institutions in other states would not have conferred the power upon the board to visit educational institutions therein.

By Laws 1878, c. 83 (G. S. 1894, § 410), there was created for this state the office of public examiner; and such officer was authorized (section 411) to assume and exercise a constant supervision over the books and financial accounts of the several public, educational, charitable, penal, and reformatory institutions belonging to the state. Here the distinction always kept in mind in legislation was again made between educational and charitable institutions, both classes being specified as within the supervision of the examiner. By Laws 1885, c. 167 (G. S. 1894, § 3636), annual inventories of state property were provided for; and it was enacted that such inventories should be taken of all of the property belonging to the state in the penal, reformatory, charitable, and educational institutions. Here, again, was the distinction made, and these institutions separately designated. We might cover pages with these pertinent illustrations, but we have given enough to show the uninterrupted course of legislation, and the universal method adopted by the legislators when considering these institutions. Why mention each class, if unnecessary?

I have alluded to an adherence to this same method of expression and reference in all executive documents which have been issued during our entire statehood, and, further to emphasize the point, call attention to the inaugural message before mentioned, delivered by Governor Van Sant in January, 1901, at the beginning of the legislative session at which this law was enacted. Under the head-

ing, "Board of Control for Correctional and Charitable Institutions," the governor urged the passage of an act providing for such a board for "correctional and charitable institutions"; and later on, after discussing other topics, and under the title of "Education," he further urged that a "state board of education, with such powers and duties as will unify and strengthen the entire system, and insure its economical operation," be created,—a board to assume the functions, discharge the duties, and supersede several existing boards therein specified, having charge of the educational institutions of the state. That the governor did not confound charitable with educational institutions, and that he expected the distinction to be maintained, and the financial management kept separate, is demonstrated by the fact that in this message he urged the creation of a board of charitable, reformatory, and penal institutions, and another board with like powers and duties for educational institutions.

With these distinct recommendations in the minds of the people, would they expect that in a bill expressly and solely providing, according to its title, for a board of control for charitable, reformatory, and penal institutions, the legislature would incorporate provisions extending the powers and duties of such a board over the finances of all educational institutions? Certainly not. I assert that there has been a line of demarkation clearly and consistently maintained in all legislation affecting educational and charitable institutions in this state. They have been brought in sharp contrast. No man upon reading the title of this bill as it was originally introduced, and as it finally passed, would for a moment imagine that it had to do with educational institutions, or that it contained important provisions relating to and applicable to our state university, to our normal schools, and to all classes of public schools. That it does apply to all of these institutions follows inevitably from the conclusion of the majority in this case. All are brought under the supervision of the board of control in financial matters. It was a very simple thing to have made this title broad enough to embrace these institutions, but, instead of a perfect title, we find a legislative omission, intentional or otherwise; and this court is called upon to supply the defect by judicial construction.

In doing this the court invades the province of a distinct and separate branch of the government, and unwittingly violates the fundamental law itself.

This brings me to matters more closely connected with the law now under consideration; reference being made to the journals of the house and senate of the session of 1901, taking, as this court does, judicial notice of their contents. The act to create and establish a board of control was introduced in the house January 16, 1901 (H. F. No. 36). Its title was as follows:

"A bill for an act to create a state board of control, and provide for the management and control of the charitable, reformatory and penal institutions of the state, and to provide for supervisory powers over the state educational institutions, and to make an appropriation therefor and to abolish the state board of corrections and charities."

The bill was then referred to the committee on general legislation, and reported back March 7, with the recommendation that it pass as amended. By these proposed amendments all provisions relating to the exercise of supervisory power over our educational institutions were stricken out and removed, and the title amended so as to read thus:

"An act to create a state board of control, and to provide for the management and control of the charitable, reformatory and penal institutions of the state, and to make an appropriation therefor, and to abolish the state board of corrections and charities."

The bill was under discussion on March 14, and an attempt was made to amend the title by inserting the word "educational" just prior to the word "charitable," so that the title would read, the "educational, charitable, reformatory and penal institutions" of the state. This amendment was rejected by a very decisive vote, as were amendments proposed to the body of the act designed to bring and include the state university, the normal schools, and the soldiers' home within its scope. According to the record, there was manifested a very decided opposition to the project to include the educational institutions and soldiers' home, and the attempt was abandoned. The bill passed the house on March 14, precisely as it

was reported March 7 by the committee on general legislation; no reference being made to any educational institution.

I now call attention to the fact that the title was determined upon and agreed to when the bill passed the house, March 14, and that it has never been changed in any manner. As the bill passed the house, the board of control was given power (section 18) to manage, control, and govern the state prison, the state training school, the state reformatory, the hospitals for the insane, the institute for defectives, except the schools for the deaf and blind. The board had no other authority. No reference was made to educational institutions in either title or body of the act, and by its terms it applied expressly and simply to the charitable, penal, and reformatory institutions therein mentioned. Its title was as broad as the subjects of the act, and expressed those now covered by and mentioned in it. Its operation, as defined in the body, was limited to the institutions above mentioned, and specified in the title. The bill was received in the senate March 15. On March 19 section 18 was amended by adding thereto as follows:

"And said board shall also have exclusive control of all the financial and business affairs of the state university, the state soldiers' home and the state normal schools, and shall supervise the disbursement of all public moneys and have the care of the public property at each of said institutions. But the board of control shall not have authority to employ teachers in the educational institutions of the state, fix salaries of teachers or fix the courses of study in the educational institutions of the state. And the general educational policy and direction of such educational establishments shall remain in charge and under the control of the board of regents of the university, or the normal boards."

Other proposed amendments were defeated. On March 20 a committee was appointed to draft an amendment to be offered as a substitute for that of March 19, above quoted. Three days later this committee made majority and minority reports. The amendment proposed by the minority was adopted, and will be found as the latter part of section 18 in the law as published, commencing with the words "board of control," on the first line of page 135 of Laws 1901, c. 122, and ending with section 18 (being the greater part of the section); and under its provisions the board of control

now claims to have and exercise supervision over the normal schools. There was no attempt made in the senate to amend the title, and the bill was passed with this amendment to section 18. It was then reported back to the house as amended, a conference committee was appointed by both legislative bodies, and after a report of this committee the house concurred in the senate amendment, and the bill passed with the title unchanged,—clear, exact, and distinct, when specifying the institutions to which it should apply.

Without amending this title, there were thrust into the body of the act by amendment very complete provisions giving the board of control full power in all financial matters over the state university, the state normal schools, the state public schools, and schools for the deaf and blind,—all educational institutions, and no more charitable in their nature than they are reformatory or penal. Even when amending section 18 the legislature did not depart from the universal custom when speaking of these schools. It designated them as "educational institutions" in four different places; for it was provided (see section 18) that the board should not have control over donations or bequests to "educational institutions," and that such donations or bequests should be applied by the various boards of said "educational institutions." To these boards was reserved exclusive control over certain matters connected with the "several educational institutions." All contracts with employees of "said educational institutions" were required to be reported to the board of control. The manner in which these terms were used certainly proves that the distinction between educational and charitable institutions which has always prevailed was well understood by the committee which drafted the amendment, and by the legislature which adopted it.

I do not doubt that the members of the legislature knew the force and effect of this amendment, for the contest was exceedingly vigorous over its adoption in both houses. They were not misled. But this is no excuse for its defective and insufficient title; nor is it an answer to the assertion that the constitutional requirement was disregarded by the legislature, and has been ignored in this court. Whether the constitution has been observed and obeyed is

not to be.ascertained and disposed of as a question of fact. Full knowledge by every person in the state of the contents of an act introduced in the legislature will not justify a departure from the constitutional requirement that the subject thereof must be expressed in its title. That part of section 18 which relates to the educational institutions is directly within the constitutional inhibition, because the subject therein legislated upon was not expressed in a title, which is plain and positive. It expresses charitable, reformatory, and penal institutions, and no other, because it specifies and names them in exact terms. Its positiveness in this respect is so direct and definite that all intimation or suggestion that other institutions might be within the provisions of the act is wholly removed. The precision of the title is so pronounced that it excludes all opportunity or room for any suggestion that institutions other than those so positively specified are covered by the body of the act.

It is not what the title might intimate or suggest to the mind of the astute lawyer, informed as to the statute of Elizabeth regulating "charitable uses," or his knowledge that these words have been construed by the courts, in litigation over wills, as including educational institutions, which should govern this court in its decision upon the pending question, but, on the contrary, what would the title mean or suggest to the layman? With ordinary people and in view of the universal usage and custom in public acts and private utterances before referred to, the title was as foreign to the purpose of a part of the act as it well could be; · or the resurrected statute and the construction thereof mean nothing to citizens, as a rule. Fortunately for them, they have never heard of the statute, or the struggles which it brought to the courts, or how important it was to know these things if they would keep pace with legislative action at the session of 1901. Evidently we need more law schools or more night sessions in those we now have.

In view of the determination reached by the majority, I see no reason why, if this title had been expressly confined to educational, instead of charitable, reformatory, and penal, institutions, it might not be argued that such a title suggested and expressed reformatories, because good morals and improved conditions are taught

and insisted upon in both classes of institutions. And with the same force it might be argued that the .term "educational institutions" is suggestive of penal, because the youth of the state, between specified ages, are compelled to attend schools, and while in attendance must remain within certain prescribed territorial limits. These pupils are under compulsion and restraint, and so are the occupants of our penal institutions.

Again, the board of corrections and charities, which never had and never exercised authority over our educational institutions, was expressly referred to in the title of this act as a board to be abolished. When the title indicated that an old board, having limited jurisdiction, was to be abolished, and a new board with a different name, established in its stead, it would be perfectly natural for the people to infer that the jurisdiction of the new board was to be substantially identical with that of the old. If the jurisdiction of the new was to be vastly broader, and to be extended to new subjects, would not the ordinary person expect to find such intent fairly indicated in the title of the act?

But we are not without authority directly in point. The defense, while ingenious, is not novel, for it was urged in New York in 1900, in People v. New York, 161 N. Y. 233, 55 N. E. 1063. There the relator sought by mandamus to compel the defendant to comply with the rules and regulations of the board in the management of its corporate affairs, asserting it was subject to the relator's visitations, and to such rules and regulations as it might adopt in pursuance of the provisions of the constitution and the statute giving the board the right of visitation with respect to "charitable institutions." The defendant denied that it was a "charitable institution," or was subject to the jurisdiction of the board. The opinion of the court states that "the only question to be considered is whether the defendant is a charitable institution," within the meaning of the constitution and the statute. It was contended that, as the defendant corporation had been given legal capacity to take and administer gifts and bequests, under the statute of 43 Elizabeth, and under the general rules applicable to trusts, it was a "charitable institution." To this claim the court answered:

"It is said that this corporation, in order to promote the object of its incorporation, has been given legal capacity to take and administer gifts and bequests that would be called charitable under the statute of Elizabeth and under general rules of law applicable to trusts, and all that is quite true. But it is an error to conclude that a corporation must necessarily be of a charitable nature because it has capacity to take and administer such gifts. A very large class of corporations may do that, without affording the slightest ground for an argument that they are or must be charitable institutions or corporations. Colleges, academies and nearly all institutions of learning or of a literary character, and even cities, villages and other municipal corporations, may take and administer such gifts; but that fact cannot in the least affect their true character, or convert them into charitable institutions." Again it was said: "It is only necessary to add that if we were to hold that every corporation with capacity to take and administer such a gift or bequest is a charitable institution within the meaning of the constitution and the statute, we would have to include a great number of corporations whose objects are entirely foreign to any work of charity, even in the broadest sense. Capacity to take a bequest proceeding from charitable motives is no real test of the class to which the corporation taking it belongs."

See also People v. Fitch, 154 N. Y. 14, 47 N. E. 983. The well-considered case of State v. Nomland, 3 N. D. 427, 57 N. W. 85, is also pertinent.

Now, in view of the distinction made first in 1858 in the state constitution, since maintained in every statute wherein educational and charitable institutions have been mentioned, affirmed in every document issued by the executive department, recognized and adopted by our citizens without a single dissent, and fortified by the decisions of the courts of other states, why should the distinction be swept away, and declared not to exist, in order to uphold a defective title,—a defect easily remedied by legislation. To hold that the plain and unambiguous title to this act, readily understood by lawyer and layman, includes, comprehends, or even suggests that our normal schools are the subjects of the proposed legislation, because citizens have contributed to the purchase of lands on which the buildings have been erected, or have donated to their libraries and museums, and that these donations have made these institutions charitable, will, I believe, strike the average man as a very technical and far-fetched conclusion. Especially so when

he discovers that it is based upon an old English statute enacted in 1601, and decisions made thereunder. To him it will appear that the question at issue is not what would have been suggested by the title in 1601, when the statute of Elizabeth was enacted and construed, but, rather, what might be suggested three hundred years later, in 1901, at a time when all thought that educational institutions were ever regarded as of a charitable nature has, for more than a century of our public school system, had no place in our minds. I am unable to discover in the title now under discussion the slightest hint which would direct my mind toward this ancient statute, or to these venerable decisions, or suggest that in them was the answer to the claim that the fundamental law was violated on the passage of this law.

I cannot agree to the doctrine of the majority that while the state university, and the normal and other public schools, are not, as "a matter of fact," charitable institutions, they are just charitable enough to sustain the title to chapter 122. To the thousands who have attended our state university, or our normal and public schools, and have received instruction therein in the belief that they were exercising an absolute right, instead of accepting benevolence, the information that they have been educated in charitable institutions, or institutions charitable in any sense or for any purpose, will come as a surprise, perhaps unpleasant, possibly amusing. To them and to all who have taken pride in these institutions of learning may come the depressing conviction that, after all, education in this commonwealth is nothing but a mere boon, which we may grant or withhold at pleasure; that our schools are simply gratuities, which we can furnish or not, as we choose; and that our entire educational system, instead of being the unquestionable right of all residents in this land, as we have boasted, is a bounty, and therefore in the same category as hospitals for the insane, homes for the indigent, and other institutions of a charitable character.

I can arrive at no other conclusion than that by the majority opinion the constitutional provision in question has been circumscribed until it is of little value, or, to use the words of the great

Chief Justice Marshall under like circumstances, it has been "restricted into insignificance."